## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**BRANDON ELLIS, JEREMY ARTIS,**
**and VASSHAWN ROBINSON,**

        **Plaintiffs,**

**vs.**                                        **No.**

**HOBBS POLICE DEPARTMENT,**
**SERGEANT JASON HERRERA,**
**LIEUTENANT CHAD WRIGHT,**
**LIEUTENANT SHANE BLEVINS,**
**OFFICER JEREMY KIRK,**
**OFFICER MATTHEW BURLESON,**
**OFFICER JIMMY GRIMES,**
**CHIEF OF POLICE CHRISTOPHER MCCALL,**
**and CITY MANAGER J.J. MURPHY,**

        **Defendants.**

## COMPLAINT FOR VIOLATIONS OF THE WHISTLEBLOWER PROTECTION ACT, AND FOR VIOLATIONS OF THE FOURTEENTH AND FIRST AMENDMENTS OF THE UNITED STATES CONSTITUTION

      Plaintiffs Brandon Ellis and Vasshawn Robinson, African-American police officers,

members of a protected class, and Plaintiff Jeremy Artis, an Anglo police officer, bring this

complaint under NMSA 1978, § 10-16C-1 through Section 10-16C-6, the Whistleblower

Protection Act, and 42 U.S.C. § 1983 and § 1981 for damages resulting from race discrimination

in violation of the due process clause and equal protection clause of the United States

Constitution; and, resulting from the retaliation against them for engaging in protected activities,

associating with one another, and the National Association for the Advancement of Colored

People (NAACP), and engaging in speech while employed by the Hobbs Police Department

(hereinafter referred to as "HPD") as police officers voicing publicly concern for the safety,

wellbeing, and constitutional rights of African Americans and people of color living in the City of Hobbs.

## JURISDICTION AND VENUE

Plaintiffs bring this Complaint under 42 U.S.C. § 1983 and Section 1981 for damages resulting from the Deprivation of Civil Rights inflicted upon them by Defendants. This Court has subject matter jurisdiction pursuant to 28 U.S.C § 1331. Personal jurisdiction is proper since all parties reside, are employed or have significant contacts in the District of New Mexico. Additionally, Defendants' actions giving rise to Plaintiffs' claims took place within the District of New Mexico. Venue is properly laid in this Court pursuant to 28 U.S.C. § 1391(b) as Defendants' actions causing injury to the Plaintiffs took place within the District of New Mexico. This Court has supplemental jurisdiction under 28 U.S.C. § 1367 for Plaintiffs' claims brought under NMSA 1978, § 10-16C-1 through Section 10-16C-6 of the Whistleblower Protection Act.

## PARTIES

1.      Plaintiff Brandon Ellis (hereinafter referred to as "Brandon") was an African-American officer employed by HPD in the City of Hobbs, New Mexico.

2.      Plaintiff Jeremy Artis (hereinafter referred to as "Jeremy") was an Anglo officer employed by HPD in the City of Hobbs, New Mexico.

3.      Plaintiff Vasshawn Robinson (hereinafter referred to as "Vasshawn") was an African-American officer employed by HPD in the City of Hobbs, New Mexico.

4.      Defendant HPD is an entity within the City of Hobbs, State of New Mexico, and a municipality and person pursuant to Section 1983.

5.      Defendant Chief of Police Christopher McCall (hereinafter referred to as "McCall") was always an employee of HPD and a policymaker for the City of Hobbs.  McCall is sued in his official and individual capacity. (See ¶¶ 39, 54, 56, 57, 121, 183, 201.)

6.      Defendant City Manager J.J. Murphy (hereinafter referred to as "Murphy") was always an employee of the City of Hobbs and a policymaker for the City of Hobbs.  Murphy is sued in his official and individual capacity. (See ¶¶ 39, 59, 183, 201.)

7.      Defendant Sergeant Jason Herrera (hereinafter "Sgt. Herrera," or "Herrera") was always an employee of HPD and sued in his official and individual capacity. (See ¶¶ 21, 22, 26, 27, 39, 45, 46, 51, 53, 54, 55, 201.)

8.      Defendant Lieutenant Chad Wright (hereinafter "Lt. Wright," or "Wright") was always an employee of HPD and sued in his official and individual capacity. (See ¶¶ 8, 129, 168, 201.)

9.      Defendant Lieutenant Shane Blevins (hereinafter "Lt. Blevins," or "Blevins") was always an employee of HPD and sued in his official and individual capacity. (See ¶¶ 45, 84, 85, 86, 95, 146, 178, 168, 201.)

10.     Defendant Officer Jeremy Kirk (hereinafter "Kirk") was always an employee of HPD and sued in his official and individual capacity. (See ¶¶ 101, 102, 103, 104, 105, 168, 201.)

11.     Defendant Officer Matthew Burleson (hereinafter "Burleson") was always an employee of HPD and sued in his official and individual capacity. (See ¶¶ 141, 143, 145, 146, 147, 201.)

12.     Defendant Officer Jimmy Grimes (hereinafter "Grimes") was always an employee of HPD and sued in his official and individual capacity. (See ¶¶ 72, 75, 201.)

## FACTUAL BACKGROUND

13.     During the time HPD employed the Plaintiffs, each Plaintiff police officer witnessed and endured racial discrimination and attempted to report it.

14.    Each Plaintiff endured subsequent retaliatory actions for reporting racial discrimination and for associating with one another.

15.    The retaliatory actions toward each Plaintiff were conducted by either several or all the Defendants or the Defendants' employees.

16.    The retaliatory actions forced each Plaintiff to seek employment elsewhere; although, when they tried to apply elsewhere, individuals at HPD ensured they would not get hired.

17.    All Plaintiffs eventually found employment at Lea County Sheriff's Department (hereinafter referred to as "LCSD"), making $6 less per hour in wages in comparison to what they had made at HPD.

18.    Below are some of the accounts of what each Plaintiff faced, in retaliation for either unveiling unlawful HPD practices within the African-American community living in Hobbs, New Mexico, or for associating with one another.

**I.    Brandon Ellis**

19.    Defendants told Brandon he needed at least 80 traffic stops per month.

20.    Although there were no specific types of arrests required, Defendants told Brandon, "if arrests aren't in double digits, you're not doing your job."

21.    Furthermore, Brandon was told by Sgt. Herrera to "spend more time on the east-side. That is where you need to get stops."

22.    Herrera also told Brandon that if he didn't get more stops that he would be written up, and that after the write-up, if Brandon didn't get better he would be put on a PIP (Performance Improvement Program).  Herrera said if it didn't improve after that, Brandon would be terminated.

23.     The east-side is a predominantly minority, African-American community within the City of Hobbs.

24.     Ten Field Investigation (FI) cards were needed per month to confirm where Brandon would spend his time.

25.     Discrimination would follow the officers from the field to the workplace.  Officers were directed to make their quota by stopping citizens of color and African-American officers, such as Plaintiffs, were mocked and degraded while on the job for failing to do so.

26.     Brandon reported Officer Berdoza (hereinafter referred to as "Berdoza") using the N-word to Sergeant Miller (hereinafter referred to as "Miller") after Berdoza stated in a briefing "looks like we arrested a lot of Niggas today". Brandon reported to Sgt. Miller that Berdoza had been using the N-word frequently and Sergeant Herrera was allowing him to do it.

27.     Sergeant Herrera and Sergeant Miller failed to discipline Berdoza for using the N-word; rather when Brandon was assigned to Herrera's shift, he initiated an IA against Brandon in the context of an IA against African-American Officer William Jackson. Sgt. Herrera brought Brandon's name up as a witness to the IA even though he had nothing to do with it.

28.     Brandon's IA investigation was for insubordination, for performing the same action two other Sergeants and one other Officer (all non-African-American) did, without consequence.

29.     Officer William Jackson and Brandon were the only officers to receive discipline out of the IA, and were the only ones to receive termination notices.

30.     HPD took further action during this investigation alleging Brandon lied by omission during a phone call with HPD Captain Charles Cunningham (hereinafter referred to as "Cunningham").

31.     This phone call was while Brandon was off-duty, which Brandon believed to be a casual call, because that is what Cunningham said over the phone.

32.     It was not until after the fact that Brandon found out the call was for an IA investigation, and he had allegedly omitted "necessary" facts.

33.     The purpose of not telling Brandon the true nature of the conversation, was to falsely claim that Brandon was untruthful, to damage his chances at future employment.

34.     HPD tried to terminate Brandon, before trying to suspend him 40 hours.

35.     In the end, Brandon received 20 hours of suspension.

36.     Throughout the time he was waiting for the "termination notice" administrative hearing, Brandon still showed up for work.

37.     During this same time, Brandon and Vasshawn, met with Joe Cotton (hereinafter referred to as "Cotton"), President of the Hobbs chapter of the NAACP, and discussed the common practices and culture surrounding HPD targeting the African-American community to make quota and their own difficulties as African-American officers working in HPD.

38.     Plaintiffs asked Cotton to set up a meeting with HPD, concerning the targeting of African Americans to make a traffic stop and an arrest quota.

39.     Cotton informed Herrera, McCall and Murphy that certain officers needed to be talked to, for the behavior of making quota by targeting the African-American community had to stop.

40.     After this meeting, retaliation towards Brandon increased dramatically as follows:

41.     Brandon responded to a use of force call, but his pocket recorder was not recording.

42.     Brandon was written up.

43.     The other on scene officer, a non-African-American officer Brandon was with, whose pocket recorder was not recording either, received no write-up.

44.     This write-up was used for subsequent reprimand.

45.     Herrera gave Brandon a bad yearly evaluation, even though he was not in direct supervision of Brandon the entire year. Brandon received a good evaluation the previous year. When Brandon received his last bad yearly evaluation from Sgt. Herrera, Herrera told him the yearly evaluation was approved by both Captain Blevins and Deputy Chief Dunlap (hereinafter referred to as "Dunlap").

46.     Among other things, Herrera wrote that Brandon would not respond to "high risk situations," potentially harming his chances at employment elsewhere.

47.     Brandon received a good evaluation the previous year prior to his objecting to the practice of targeting the African-American community to make quota.

48.     On July 12, 2016, Brandon was dealing with a combative person.

49.     This person was put in a patrol vehicle and transported to jail.

50.     Common practice with a combative, violent subject, is to use as many officers as possible, to avoid injury towards any one officer.

51.     While Brandon was transporting the subject to jail, Herrera told everyone over the radio to "stand back," and let Brandon and another rookie officer handle the subject alone.

52.     This is contrary to protocol, and other officers were confused by it.

53.     Herrera's actions placed Brandon and the rookie officer in danger, and it could have resulted in bodily harm towards them.

54.     Brandon also informed McCall that he felt Herrera was discriminating against him. McCall told Brandon he would change Brandon to a different shift but he never did.

55.     One day while Brandon was at work, Herrera drove by his house three times, when his wife was alone doing yard work in the front.

56.     Brandon informed McCall of this incident, but no actions were taken.

57.     When Brandon attempted to find employment elsewhere, McCall did not give him an exit interview.

58.     Exit interviews are common practice for employees who are leaving.

59.     Brandon attempted to schedule a meeting with Murphy, but Murphy refused.

60.     After leaving HPD, Brandon did not receive the last $5,000.00 of his $25,000.00 sign on bonus, which was being given to him in yearly installments of $5,000.00

**II.     Jeremy Artis**

61.     Jeremy has a total of eight (8) years military and police force experience.

62.     During Jeremy's Field Training Program (hereinafter referred to as "FTO"), he was specifically told that the black community is where officers stay to fill their quotas.

63.     Also during Jeremy's FTO phase, some Training Officers (hereinafter referred to as "TOs") would search vehicles without a warrant.

64.     These officers would coerce people into letting them search their vehicles.

65.     Jeremy found this to be common practice throughout HPD.

66.     Following the meeting between Cotton and HPD, Jeremy faced retaliation for his interracial relationship with Vasshawn.

67.     Jeremy, along with Vasshawn (who also served in the military), was degraded and told "his military service doesn't mean jack."

68.     On September 5, 2016, Jeremy was almost arrested on a false claim.

69.     On September 5, 2016, Jeremy and his fiancé got into an argument.

70.     When Jeremy got home after work, Corporal Crowder (hereinafter referred to as "Crowder") and Brandon came to his residence to ensure everything was okay.

71.     Crowder and Brandon left once they saw everything looked to be fine.

72.     Afterwards, HPD showed up, without a dispatch to the residence, and Grimes attempted to arrest Jeremy.

73.     New Mexico State Police (hereinafter referred to as "NMSP") arrived shortly after that, and made HPD leave the scene for lack of jurisdiction.

74.     Jeremy submitted a complaint to HPD, as well as a memo to the local LCSO, but HPD took no action.

75.     Following this incident, Grimes would say things to trainees about Jeremy, including, "[Jeremy] he's a piece of shit; he couldn't cut it as a real cop; he doesn't know what he's doing; he's a bad influence."

76.     On March 4, 2017, Jeremy and Vasshawn were eating at a sports bar, when they encountered an intoxicated individual who rode his motorcycle to the bar.

77.     Jeremy tried to get the bartender to stop serving the individual, as well as prevent him from taking off.

78.     Jeremy also called dispatch to stop the motorcyclist.

79.     The motorcyclist left before dispatch arrived.

80.     Once dispatch arrived, Officer Randy Mills (hereinafter referred to as "Mills") arrived and yelled at Jeremy and Vasshawn, and degraded them in front of everyone for not using their positions to stop the motorcyclist.

81.     Jeremy and Vasshawn were both off-duty, and were not able to lawfully stop the motorcyclist.

82.     Jeremy and Vasshawn filed a formal Complaint, but no action was taken.

83.     Jeremy was prevented from working overtime at HPD, limiting his hours to only 40 per week, while some coworkers could work twice as many.

84.     When Jeremy told HPD he was moving, Lt. Blevins asked why he was leaving.

85.     Jeremy told Blevins that his fiancé was from Tennessee and wanted to move back.

86.     Blevins told Jeremy to tell his fiancé, "Grow the 'F' up. Put on some big girl panties and deal with it."

87.     Jeremy and Vasshawn left HPD at the same time together.

88.     The Defendants did everything in their power to ensure that Jeremy could not get a job elsewhere.

89.     Jeremy applied to Sandoval County, where Lt. Elder said, "Everything was a go."

90.     Once Elder contacted HPD, he stopped communicating with Jeremy.

91.     Jeremy also applied to the Santa Fe County Sheriff's Office (hereinafter referred to as "SFCSO").

92.     A deputy from the SFCSO went down to Hobbs to meet with the Sheriff's office and HPD, about Jeremy's hiring.

93.     After the deputy's trip to Hobbs, Jeremy never heard back from the SFCSO.

94.     Jeremy eventually heard from another HPD deputy that HPD had "blackballed" him.

95.     This deputy told Jeremy that Lt. Blevins said that, "[Blevins was] going to make sure no one hired Jeremy Artis, and [Blevins] would say whatever bad things necessary about Jeremy to ensure this."

**III.     Vasshawn Robinson**

96.     Vasshawn witnessed several concerning practices from the onset of his employment at HPD.

97.   Vasshawn was written up by his TO the very first day, for only making one of the required twenty traffic stops in under an hour.

98.   This traffic stop quota was not in direct response to an amount of traffic violations occurring.

99.   After this write-up, Vasshawn was not allowed to drive the rest of his training period.

100.   Vasshawn understood that he would be put on probation for not filling quotas.

101.   One of Vasshawn's TOs, Officer Jeremy Kirk (hereinafter referred to as "Kirk"), got promoted to K-9 unit.

102.   On one occasion, Kirk stopped a woman.

103.   Kirk asked her if he could search her car.

104.   When the woman said "no," Kirk pointed to the side of his car and said, "Do you see that? If you don't let me search the car, I will use my K-9 and find whatever it is you are hiding."

105.   This remark coerced the woman into allowing Kirk to search her vehicle.

106.   Vasshawn was routinely told to go to the "east-side" for his patrol and to fill his quotas there by citing or arresting African Americans.

107.   Vasshawn was never told to go to a wealthy or Anglo neighborhood to fill his quotas.

108.   Vasshawn was sexually and racially harassed in his second week by Mills.

109.   Vasshawn's German Shepard puppy was sick. He had to take him to the vet because the puppy was dying.

110.   Mills made the statement, "stop putting peanut butter on your dick and giving your dog syphilis."

111.   The next day, other HPD officers made the same joke.

11

112.    Vasshawn confronted them, and was written up; while the officers making the sexual and racist joke were not written up.

113.    During Vasshawn's training, the white-male trainees could sit at the table at lunch.

114.    Vasshawn, being the only one of color, was the only one who had to stand in a corner.

115.    He was told that he "was not allowed" to sit with them.

116.    Vasshawn, like Jeremy, was told that "military service does not mean jack here," and not to bring it up.

117.    Vasshawn once overheard Officer Ast (hereinafter referred to as "Ast") and another officer from SWAT talking about Brandon's family.

118.    Ast said, "Sgt. Stodder fucked Ellis's wife and that's why his daughters came out like that."

119.    Ast's comment was in remark to Brandon's daughters not having the same skin color pigmentation as Brandon.

120.    Vasshawn met with Cotton, along with Brandon and Jeremy to disclose the hostile culture and improper practices at HPD towards African-American officers, those having interracial relationships with African Americans, and the African Americans living in Hobbs, New Mexico.

121.    Following his disclosure to Cotton of the HPD culture and practices, and the subsequent meeting between Cotton and McCall, Vasshawn faced retaliation.

122.    In January 2016, during a snow storm, Vasshawn's TO said he better make it to work or else he would get written up.

123.    Vasshawn was expected to make it from Albuquerque.

124.    His TO lived in Roswell, which Vasshawn had to pass through to make it to Hobbs.

125.    After getting through Roswell, Vasshawn crashed his truck due to weather conditions.

126.    Vasshawn was not written up due to him making it in to work.

127.    Vasshawn's TO, a non-African-American, never showed up to work due to the bad weather.

128.    Vasshawn was forced to go through the same location and conditions that his TO was not obligated to go through.

129.    When attempting to submit a complaint, Lt. Wright told Vasshawn that his TO was in the right.

130.    On another occasion, Vasshawn and Jeremy were on call at a hospital in Hobbs.

131.    While they were on call, a man shot himself in front of the hospital.

132.    Vasshawn was ready to perform CPR (Cardiopulmonary Resuscitation).

133.    HPD Officer Buscher (hereinafter referred to as "Buscher") showed up, and pronounced the man "dead."

134.    When Vasshawn reached to check the man's vitals, Buscher yelled "Don't touch him!"

135.    It was found 30 minutes later that the man was still alive, and would have ultimately had a good chance of surviving if he had been treated sooner.

136.    Jeremy submitted a complaint to HPD, as well as a memo to the local LCSO about the situation, but HPD took no action.

137.    On another occasion, Vasshawn was working a late shift.

138.    At 3 a.m. his superior allowed him to go home and rest for a bit, because he was tired.

139.    Shortly after Vasshawn arrived at his apartment, another Deputy came to his door to check on him.

140.    A fight subsequently broke out outside his complex, and Vasshawn called HPD.

141.    When HPD arrived, Officer Burleson (hereinafter referred to as "Burleson") ignored the fight and went straight to Vasshawn and asked if he was drinking, saying, "Your eyes look bloodshot."

142.    The people in the fight were the ones drinking, not Vasshawn.

143.    Burleson called a supervisor to disarm Vasshawn.

144.    Vasshawn was still on duty, and the supervisor would not comply.

145.    Burleson then went on to tell all dispatchers that Robinson drinks on duty.

146.    Burleson also then told multiple Lieutenants, including Lt. Blevins, that Vasshawn was drinking on duty.

147.    Burleson's slanderous conduct towards Vasshawn significantly reduced Vasshawn's credibility at work.

148.    Vasshawn made a formal complaint, and submitted a memo to the local Sheriff's Office about the events on March 4, 2017, in which he and Jeremy were publicly humiliated for not stopping an intoxicated motorcyclist.

149.    The complaint resulted in no actions taken by HPD.

150.    Vasshawn was told he would not pass field training.

151.    When he asked about it, his TO said, "Robinson, this is what I was told to do."

152.    Essentially, the chain of command told Vasshawn's TO to fail him.

153.    Vasshawn attempted to seek employment elsewhere.

154.    When Vasshawn applied to the SCSD, they said they couldn't wait for him to be 'family,' telling him he was a sure hire.

155.    Sandoval County also has veteran's preference.

156.    Vasshawn was in the final process of buying a new home in Rio Rancho.

157.     SCSD then called HPD for a background check.

158.     After that, Vasshawn never heard from SCSD again.

159.     Vasshawn also applied to SFCSO.

160.     This department has veteran's preference.

161.     Vasshawn had the highest applicant score in months.

162.     Vasshawn was told he got the job, but once SCSD talked with SFCSD, he never heard from them again.

163.     When Vasshawn applied to the Drug Task Force, his first interview question was, "we heard you had conflict with HPD, how do you think you would fare here?"

164.     Vasshawn knew he would not get the job once he heard this question.

165.     Vasshawn replied to the question, "No, I didn't have any problems with them and there are no issues between myself and them."

166.     Vasshawn did not get the job.

167.     Deputy Wallace informed Vasshawn that Lt. Blevins said, "[Robinson] will never get a job in law enforcement in New Mexico until the day I die."

168.     Once Vasshawn was finally hired by LCSO, his hiring coordinator, Victor Hernandez, said Lt. Blevins, Lt. Wright and Officer Kirk from HPD called and told him not to hire Vasshawn.

### COUNT I – VIOLATIONS OF THE NEW MEXICO WHISTLEBLOWER PROTECTION ACT

169.     Plaintiffs re-allege and incorporate each paragraph above as if stated herein.

170.     HPD is a public employer as defined by NMSA 1978, § 10-16C-2.

171.     During all times relevant to this Complaint, Plaintiffs were public employees as defined by NMSA 1978, § 10-16C-2B.

172.    Plaintiffs had reasonable bases to believe that their coworkers and supervisors had acted unlawfully and improperly; and when they reported that misconduct, Plaintiffs acted in good faith.

173.    Through attempts to report the misconduct and discrimination at HPD, and ultimately unveiling the culture, Plaintiffs engaged in activities expressly protected by § 10-16C-2E and § 10-16C-3 A and B of the New Mexico Whistleblower Protection Act (hereinafter referred to as "WPA").

174.    When Plaintiffs unveiled the illegal practices and racial discrimination at HPD, Defendants retaliated by out-casting the Plaintiffs and ensuring that Plaintiffs would have to work in a difficult environment.

175.    Defendants violated the WPA by retaliating against Plaintiffs for engaging in these activities, through consistent harassment during the remainder of Plaintiffs' tenure at HPD, and through their attempts at preventing Plaintiffs from seeking further employment elsewhere.

176.    As a direct result of HPD's illegal retaliation against Plaintiffs, they are and continue to be damaged in an amount to be proven at trial, which includes but is not limited to: lost past and future wages, lost employment benefits, lost overtime, humiliation including loss of professional reputation and standing, loss of opportunities for promotions, emotional distress and other compensatory damages.

177.    Defendants effectively created a work environment that forced Plaintiffs out of HPD, and were trying to leave Plaintiffs jobless. Although Plaintiffs eventually found employment elsewhere, they had had to take a wage cut.

178.    Public policy encouraged Plaintiffs to speak out concerning the misconduct at HPD.

179.    Defendants' retaliatory conduct was such that the imposition of punitive damages is authorized.

## COUNT II – VIOLATIONS OF THE FIRST AMENDMENT RIGHTS TO FREE SPEECH TO ASSOCIATION UNDER THE UNITED STATES CONSTITUTION

180.    Plaintiffs re-allege and incorporate each paragraph above as if stated herein.

181.    Under the First Amendment of the United States Constitution, "Congress shall make no law… abridging the freedom of speech, or of the pre…." U.S.C.A. Const. Amend. I

182.    Brandon, Jeremy and Vasshawn brought forward to Cotton the racist culture within HPD and its targeting of African American minorities in their capacity as African American men, and ordinary citizens, who were concerned for the well-being of members of communities of color.

183.    Cotton spoke with McCall and Murphy about HPD's targeting of African-Americans to make a quota and the complaints of Plaintiffs.

184.    Plaintiffs intended to bring to light wrongdoings and breaches of public trust by HPD, and disclose evidence of impropriety and malfeasance within the Department to protect African Americans from invidious discrimination. Police officers are, as a class, the members of a community most likely to have informed and definite opinions as to how to police minority communities of color.   Plaintiffs are, as African-American police officers, in a valuable and unique position to provide community policing to heal distrust between the African-American community and HPD.  Accordingly, it is essential that they be able to speak out freely on questions of policing minority communities without fear of retaliatory actions or dismissal.

185.    This was a First Amendment protected speech on a matter of public concern.

186.    Defendants' interest in promoting the efficiency of its public service did not outweigh this public concern, nor invidious racial discrimination.

187.    This protected speech and their association with Cotton, one another, and the NAACP

was a motivating factor in the adverse employment actions by Defendants, taken against

Brandon, Jeremy and Vasshawn.

188.    Defendants would not have taken the same adverse employment actions in the absence of

Plaintiffs' protected conduct and association with the NAACP and one another.

189.    Defendants violated Plaintiffs' rights to free speech and to free association, guaranteed

under the First Amendment, when they unreasonably subjected Plaintiffs to retaliation for

exercising their protected rights.

190.    Plaintiffs were not afforded their constitutional right, as police offices, to speak out about

the police departments' racial discrimination against citizen members of the African-American

community and to associate with one another.

191.    Defendants punished and retaliated against Plaintiffs for their association with Cotton and

the NAACP and with one another.

192.    Defendants violated constitutional law and were deliberately indifferent to discrimination

against African Americans working for HPD and living in Hobbs, New Mexico, and for

association with African Americans working to better the lives of people of color.

193.    Defendants are liable under 42 U.S.C. § 1983.

194.    Plaintiffs seek relief from this Court under the First Amendment of the United States

Constitution.

### COUNT III – FOURTEENTH AMENDMENT VIOLATIONS OF SUBSTANTIVE DUE PROCESS AND EQUAL PROTECTION and 42 U.S.C. § 1981 FOR DISCRIMINATION BASED ON RACE
### (Against Individual Defendants)

195.    Plaintiffs hereby incorporate by reference each of the allegations set forth in the

preceding paragraphs as if re-alleged fully herein.

196.    Plaintiffs all have a liberty interest and/or property interest in their employment as police officers and their right to air their grievances for the racial harassment and race discrimination they endured and witnessed at HPD to their chain of command and to the NAACP.

197.    Defendants violated Plaintiffs' liberty interests which entitled them to the right to prevent persons in governmental positions of power from discriminating against African Americans based on race and against Anglos who are in interracial relationships with African Americans.

198.    Defendants discriminated against Plaintiffs Brandon and Vasshawn, based on their belonging to a protected class, African-American, in violation of their right to liberty and property interests and they are thus liable for intentional discrimination in violation of 42 U.S.C. § 1983 and § 1981 and violations of the Due Process and Equal Protection Clause of the Fourteenth Amendment of the United States Constitution.

199.    Defendants discriminated against Plaintiff Artis, Anglo, for his positive interracial relationships with African Americans.

200.    Title VI of the Civil Rights Act of 1964, 42 U.S.C., §§ 200(d)(1) and 42 U.S.C. § 1981 forbids all racial discrimination in the making and maintaining of private as well as public contracts.

201.    Defendants violated Section 1981 when they allowed their employees, Sgt. Herrera, Lt. Wright, Lt. Blevins, Officer Kirk, Officer Burleson, Officer Grimes, Chief of Police Mccall and City Manager J.J. Murphy, to create and maintain a racially hostile and unsafe environment for Plaintiffs at HPD.

202.    Defendants had notice of a racially hostile environment at the HPD for African-American officers and those who associate favorably with African Americans, and the Defendants failed to

adequately respond to a hostile environment and instead retaliated against Plaintiff Jeremy who associated with Plaintiffs Brandon and Vasshawn.

203.    Defendants are liable to Plaintiffs for their violations of Section 1981.

204.    Defendants are liable for punitive damages for their invidious discrimination against Plaintiffs.

205.    Defendants' actions towards these three officers and the African-American members of the community they are sworn to protect and serve shocks the conscience.

206.    Defendants' actions intentionally and willfully deprived Plaintiffs of their liberty interests and property interests without due process of law and without recourse for the arbitrary, abusive, and harassing conduct of Defendants toward Plaintiffs.

207.    Defendants' actions proximately caused damages to Plaintiffs as previously alleged.

## CONCLUSION

WHEREFORE, Plaintiffs respectfully request the Court grant judgment in their favor and against Defendants based on the violations of the New Mexico Whistle Blower Protection Act and the Equal Protection Clause and the First Amendment of the United States Constitution; award actual damages; attorney fees and costs; special damages; two times back pay with interest' pre-judgment and post-judgment interest and punitive damages against individual Defendants Sgt. Herrera, Lt. Wright, Lt. Blevins, Officer Kirk, Officer Burleson, Officer Grimes, Chief of Police McCall and City Manager J.J. Murphy for their hateful conduct towards Plaintiffs and other African Americans living and working in Hobbs, New Mexico.

Respectfully submitted,

**KENNEDY KENNEDY & IVES**


***/s/ Shannon L. Kennedy***
Shannon L. Kennedy
1000 2nd Street NW
Albuquerque, NM 87102
(505) 244-1400 / F (505) 244-1406

*Attorney for Plaintiffs*