IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

BRANDON ELLIS, *et al.*,

    Plaintiffs,

v.                                                                          Civ. No. 17-1011 WJ/GBW

HOBBS POLICE DEPARTMENT, *et al.*,

    Defendants.

## ORDER GRANTING MOTION TO QUASH SUBPOENA
## AND FOR PROTECTIVE ORDER

THIS MATTER comes before the Court on Defendants' Motion to Quash Subpoena Issued by Plaintiffs to Zia Consulting, Inc. and for Protective Order. *Doc. 161*. Having reviewed the motion and attendant briefing (*docs. 164*, *166*), the Court finds that the subpoena must be quashed because of its failure to comply with the Health Insurance Portability and Accountability Act ("HIPAA"). In addition, the Court finds that the records sought by Plaintiffs are not proportional to the needs of the case. The Court will therefore GRANT Defendants' motion.

    I.        **BACKGROUND**

On August 22, 2019, Plaintiffs issued a subpoena to Zia Consulting, Inc., ordering production of pre-employment psychological evaluation records for fifteen current and former Hobbs Police Department ("HPD") officers. *See doc. 161-4*; *doc. 161* at 2. For each officer, the subpoena sought the following specific records for each officer:

     Statement of Understanding
     Social History Survey
     Clinical Interview
     Mental Status Exam (MSE)
     Wide Range Achievement Test Reading (WRAT-3)
     Shipley Institute of Living Scale-2 (SILS-2)
     Sixteen Personality Factor 5th Ed. (1 6PF)
     Minnesota Multiphasic Personality Inventory-2 Restructured Form
     (MMPI-2 RF)

*Doc. 161-4.* Some of the listed officers are Defendants in this suit, while others are non-party witnesses. *See doc. 161* at 2. Plaintiffs have since agreed to exclude non-party witnesses and Defendant J. J. Murphy from their request. *See doc. 164* at 11. However, Plaintiffs maintain their entitlement to the pre-employment psychological evaluation records of the other officers listed in the subpoena.

     Defendants argue that the subpoena to Zia Consulting must be quashed because it is not HIPAA-compliant. *See doc. 161* at 5–7. In addition, they request a protective order prohibiting discovery of HPD officers' pre-employment psychological evaluations on the ground that (1) they are not relevant or proportional to the needs of the case, (2) they are protected by psychotherapist/patient privilege, (3) the requests subject the officers to undue burden, and (4) the officers have a constitutional right to privacy in their mental health records. *See generally id*. Plaintiffs disagree on all counts. *See generally doc. 164*. Defendants' motion is now before the Court.

## II. HIPAA COMPLIANCE

The Health Insurance Portability and Accountability Act, or HIPAA, "generally prohibit[s] covered entities[1] from using or disclosing 'protected health information.'" *Murphy v. Dulay*, 768 F.3d 1360, 1368–69 (11th Cir. 2014) (quoting 45 C.F.R. § 164.508(a)(1)). However, HIPAA regulations provide for the release of protected health information under certain circumstances. Relevant to the instant motion:

> A covered entity may disclose protected health information in the course of any judicial or administrative proceeding:
>
> […]
>
> (ii) In response to a subpoena, discovery request, or other lawful process, that is not accompanied by an order of a court or administrative tribunal, if:
>
> > (A) The covered entity receives satisfactory assurance, as described in paragraph (e)(1)(iii) of this section, from the party seeking the information that reasonable efforts have been made by such party to ensure that the individual who is the subject of the protected health information that has been requested has been given notice of the request; or
> >
> > (B) The covered entity receives satisfactory assurance, as described in paragraph (e)(1)(iv) of this section, from the party seeking the information that reasonable efforts have been made by such party to secure a qualified protective order that meets the requirements of paragraph (e)(1)(v) of this section.

---

[1] Defendants have asserted that Zia Consulting is a "covered entity" under HIPAA, *see doc. 164* at 7, and Plaintiffs do not contradict this assertion, *see generally doc. 164*. A covered entity is defined by the regulation as a "health plan," a "health care clearinghouse," or a "health care provider who transmits any health information in electronic form in connection with a transaction covered by this subchapter." 45 C.F.R. § 160.103. Based on Defendants' uncontroverted assertion and the lack of any evidence to the contrary, the Court assumes that Zia Consulting is, indeed, a covered entity.

3

45 C.F.R. § 164.512(e)(1). A covered entity receives "satisfactory assurances" if the requesting party includes a written statement and documentation demonstrating that: (1) the requesting party has made a good faith attempt to provide written notice to the subject individual, (2) the notice included sufficient information about the litigation to permit the individual to raise an objection with the court, and (3) the time for the individual to raise objections has elapsed. *Id*. § 164.512(e)(1)(iii).

Defendants contend that Plaintiffs' subpoena to Zia Consulting is deficient in that it contains no assurances of either an attempt to notify the subject individuals or reasonable efforts to secure a qualified protective order. *See doc. 161* at 5–7. Plaintiffs' do not appear to dispute this fact as their only discernible argument in opposition appears to be one of waiver: "Defendants never objected to Request for Production No. 14 on the ground that the request violated the implementing regulations found in the HIPAA." *Doc. 164* at 7.

The Court finds that Plaintiffs' subpoena to Zia Consulting, served on August 23, 2019, is indeed deficient under HIPAA regulations. Examination of the subpoena reveals no statement that could remotely be construed as an assurance either of efforts to notify the subject individuals or of efforts to secure a protective order.[2] *See doc. 161-4*.

---

[2] As Plaintiffs point out, *see doc. 164* at 10, albeit in response to another of Defendants' arguments, there is a Stipulated Confidentiality Order in effect in this case. *See doc. 29*. Whether this stipulated order would be a qualified protective order under HIPAA is debatable, since it permits opposing parties and experts to keep medical records "confidential," rather than destroying them or returning them to the covered entity, at the end of the litigation. *See id*. at 3; *cf.* 45 C.F.R. § 164.512(e)(1)(v)(B). In any event, there is no

4

Moreover, Plaintiffs' contention that Defendants did not previously object to Request for Production No. 14 appears wholly immaterial to the issue at hand. For one thing, Defendants' counsel lack the authority to waive HIPAA requirements for covered entities, particularly with respect to non-represented parties. For another, the Court is puzzled to understand how Defendants could have known that Plaintiffs' subpoena would be non-compliant until it was actually issued and served. Therefore, the Court finds that the subpoena served on Zia Consulting on August 23, 2019 (*doc. 161-4*) violates HIPAA and must be quashed.

## III.  RELEVANCE & PROPORTIONALITY

Defendants further request a protective order prohibiting future discovery of the officers' pre-employment psychological evaluations. Defendants make a number of different arguments in support of this request. *See generally doc. 161.* Because the Court finds that discovery of these psychological evaluations is not proportional to the needs of the case, it does not reach the issues of privilege, constitutional right to privacy, or undue burden as standalone bases for the protective order.

The Federal Rules of Civil Procedure provide that:

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense *and proportional to the needs of the case*, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the

---

question that the Stipulated Confidentiality Order was not explicitly referenced in Plaintiffs' subpoena to Zia Consulting as required by 45 C.F.R. § 164.512(e)(1)(ii)(B). *See generally doc. 161-4.*

importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

Fed. R. Civ. P 26(b)(1) (emphasis added). Information "need not be admissible in evidence to be discoverable." *Id*. However, "Rule 26 vests the trial judge with broad discretion to tailor discovery narrowly." *Murphy v. Deloitte & Touche Group Ins. Plan*, 619 F.3d 1151, 1163 (10th Cir. 2010) (quoting *Crawford-El v. Britton*, 523 U.S. 574, 598 (1998)).

Plaintiffs' Complaint contains three claims: (1) retaliation for whistleblowing in violation of the New Mexico Whistleblower Protection Act, (2) retaliation for protected speech and association in violation of the First Amendment and 42 U.S.C. § 1983, and (3) racial discrimination and deprivation of due process in violation of the Fourteenth Amendment, 42 U.S.C. § 1981 and § 1983. *See doc. 1* at 15–20. In their response to Defendants' motion, Plaintiffs offer a number of reasons why discovery of the subpoenaed records is relevant to these three claims.[3] The stated reasons fall into roughly four categories: (1) to demonstrate the individuals' psychological fitness to serve as HPD officers; (2) to demonstrate HPD's pattern of hiring officers with poor "moral character"; (3) to determine whether these individuals harbor "racist

---

[3] As Defendants correctly note in their reply, Plaintiffs do not address how or why the requested discovery is proportional to the needs of the case. *See doc. 166* at 6 ("Plaintiffs failed to respond to Defendants' argument that the records … are not proportional to the needs of this case. As such, Plaintiffs have conceded this argument."). The Court declines, however, to find automatically in favor of Defendants on that basis.

6

tendencies"; and (4) for general purposes of credibility and impeachment.[4] *See generally doc. 164*. The Court will address each in turn.

A. <u>Psychological Fitness</u>

First, the Court finds that evidence of the Defendant officers' psychological fitness to serve as HPD officers is insufficiently relevant to Plaintiffs' claims to justify the proposed serious intrusion on those officers' privacy interests. Their psychological fitness to serve (as distinct from their "moral character" or racist tendencies, which will be explicitly addressed below) appears potentially relevant only to demonstrate that, as Plaintiffs put it, "these Officers were as or less psychologically fit to serve as Hobbs Police Department officers than any of the Plaintiffs." *Doc. 164* at 6. In other words, at most, evidence of psychological instability or unfitness might demonstrate that Plaintiffs were at least as qualified as the Defendant officers, eliminating one alternative explanation for Plaintiffs' differential treatment. *See, e.g., Wells v. Colo. DOT*, 325 F.3d 1205, 1218 (10th Cir. 2003) (quoting *Reeves v. Sanderson Plumbing, Inc.*, 530 U.S. 133, 147 (2000)) (elimination of other plausible justifications for employment discrimination can show that "discrimination may well be the most likely alternative explanation").

---

[4] Plaintiffs additionally make a fifth argument: that Plaintiffs' own medical records "show that HPD was aware that these men have pre-existing psychiatric injuries" from their military service, but "then turned around and mocked" their service. *Doc. 164* at 9. Because Defendants do not seek a protective order preventing Plaintiffs from disclosing their own psychological evaluations, the Court declines to address this argument.

7

However, the relevance of pre-employment psychological evaluations for this purpose is doubtful at best. This is not a discriminatory hiring case. Indeed, each Plaintiff was successfully hired by HPD following his psychological evaluation, notwithstanding the fact that Plaintiffs Ellis and Robinson are African American. Therefore, a comparison of Plaintiffs' employment applications to the Defendant officers' employment applications appears unlikely to advance Plaintiffs' claims; of far more relevance would be a comparison of their on-the-job performance. As for Plaintiffs' contention that the subpoenaed records would support their municipal liability claim, *see doc. 164* at 4, a pattern of hiring officers who are psychologically unfit in some general sense—as distinct from racially biased—would do little to establish whether those same officers engaged in racial discrimination, or whether HPD should have anticipated that they would.

In addition, though the Court here refrains from deciding whether the federal psychotherapist-patient privilege applies to the subpoenaed records, the importance of the privacy interests at stake is readily apparent. The Court's evaluation of relevance and proportionality must be particularly stringent where personal, confidential information is involved. *See Regan-Touhy v. Walgreen Co.*, 526 F.3d 641, 648–49 (10th Cir. 2008) (quoting *Herbert v. Lando*, 441 U.S. 153, 177 (1979)). The Tenth Circuit has recognized a constitutional "right to privacy" in personnel file information that is "of a highly personal nature." *Flanagan v. Munger*, 890 F.2d 1557, 1571 (10th Cir. 1989). In the

interest of maintaining privacy, it may often be acceptable for the trial court to limit discovery of personnel files. *See Regan-Touhy*, 526 F.3d at 649 (citing *Gehring v. Case Corp.*, 43 F.3d 340, 342 (7th Cir. 1994)). More specifically, courts have repeatedly recognized the importance of confidentiality in communications with mental health professionals. *See, e.g., Jaffee v. Redmond*, 518 U.S. 1, 8–9 (1996) (recognizing a federal common law psychotherapist-patient privilege).

Although, as Plaintiffs point out, the Defendant officers did not voluntarily seek psychological treatment or diagnosis, their psychological evaluations are nonetheless of a "highly personal" nature. In addition, even if the Defendant officers knew that part or all of their evaluations might be shared with high-ranking HPD officials, they nevertheless had a reasonable expectation of confidentiality with respect to other persons and entities. *See* NMAC § 10.29.9.12.A(7) (mandatory psychological evaluations "shall be held in the strictest of confidence"). The important public policy rationale underlying the Supreme Court's decision in *Jaffee*—the encouragement of full and free communication with mental health professionals—is therefore to some degree applicable in this context. *See Jaffee*, 518 U.S. at 11. It is greatly in the public interest that potential HPD officers answer questions honestly and openly during their pre-employment psychological evaluations. *See, e.g., Gavins v. Rezaie*, 2017 WL 3218506, at *2–3 (S.D. Fla. July 28, 2017) (quoting *Caver v. City of Trenton*, 192 F.R.D. 154, 163 (D.N.J. 2000)).

Therefore, without deciding whether any absolute psychotherapist-patient privilege applies, the Court takes into account the Defendant officers' privacy interests in conducting its proportionality analysis. *See Northwestern Mem'l Hosp. v. Ashcroft*, 362 F.3d 923, 927 (7th Cir. 2004) (district court properly weighed the limited probative value of sensitive medical records against the "potential loss of privacy" to the patient, concluding that "the balance of harms resulting from disclosure severely outweighs the loss to the government through non-disclosure"). Because the Court finds that the potential relevance of demonstrating the Defendant officers' psychological fitness to serve at the time of application is minimal, and the privacy interests at stake are very weighty, the requested discovery is not proportional to the needs of the case.

B. Moral Character

Second, Plaintiffs argue that the psychological evaluations are relevant to show HPD's pattern or practice of hiring officers with poor "moral character." The Court discerns two problems with this argument.

To begin with, the likelihood that the subpoenaed evaluations will reveal anything about the officers' "moral character" appears rather low. Of the eight specifically requested components listed in Plaintiffs' subpoena, *see doc. 161-4 at 4–8*, four are standardized clinical assessments not designed to reach conclusions about a

subject's "moral character."[5]  The Statement of Understanding merely informs the test-taker of the purpose for the evaluation.[6]  Another component, the Mental Status Exam, is generally used to assess current mental capacity and cognitive function.[7]  While the Social History Survey and Clinical Interview components are presumably somewhat more open-ended, Plaintiffs offer no evidence that either one is designed to elicit responses or enable conclusions about an applicant's generalized "moral character." Rather, the stated purpose of psychological evaluations for law enforcement officers in the state of New Mexico is to "certify to the individual's emotional and mental condition."  NMAC § 10.29.9.12.A(1).  *See also id*. § 10.29.9.12(B)(5) (clinical interview should cover such areas as schooling, job history, substance abuse, judgment, and reliability); NMSA § 29-7-6(A)(6) (applicants are qualified if "free of any emotional or mental condition that might adversely affect [] performance as a police officer").  Of course, it is possible to imagine that information relevant to a subject's moral character might incidentally be revealed through these psychological evaluations.  For instance, as Plaintiffs observe, evidence of "anti-social and sociopathic tendencies" might have significant bearing on a measure of Defendants' "moral character."  *See doc. 164* at 6.

---

[5] These standardized clinical assessments are the Wide Range Achievement Test Reading (WRAT-3), the Shipley Institute of Living Scale-2 (SILS-2), the Sixteen Personality Factor 5th Ed. (1 6PF), and the Minnesota Multiphasic Personality Inventory-2 Restructured Form (MMPI-2 RF).  *Doc. 161-4* at 4.
[6] *See* Michelle Hoy-Watkins & Megan E. Shaal, *Competency to Stand Trial*, *in* Inside Forensic Psychology 26 (Tiffany Masson, PsyD ed., 2016).
[7] *See* George Newman, M.D., PhD, *How to Assess Mental Status*, Merck Manual Professional Version (Feb. 2018), https://www.merckmanuals.com/professional/neurologic-disorders/neurologic-examination/how-to-assess-mental-status#v1030587.

11

However, because poor moral character is not in itself a recognized emotional or mental condition, it is far from certain that any information relevant to moral character would be revealed.

More importantly, even assuming that such information *was* to be found in some of the psychological evaluations, the relevance of the Defendant officers' generalized "moral character" to Plaintiffs' claims is not readily apparent. Whether the Defendant officers have "good moral character," *doc. 164* at 9–10, is only tangentially related to whether or not they racially discriminated against Plaintiffs. Similarly, their "good moral character" or lack thereof is insufficiently specific to greatly assist in establishing whether Plaintiffs reported illegal and racially discriminatory conduct and were consequently retaliated against. This is particularly true given that some of the subpoenaed psychological evaluations may have been conducted years or even decades ago.[8] Even if, as Plaintiffs point out, New Mexico statutory law requires police officer applicants to be "of good moral character," NMSA § 29-7-6(A)(7),[9] the Court finds that the potential relevance of the subpoenaed records to demonstrate Defendants' "moral character" is insufficient to outweigh the important privacy interests discussed above.

---

[8] Defendant McCall, for example, was hired by HPD in 1999, some thirteen years before Plaintiff Ellis arrived. *See doc. 143* at 4, 15.

[9] Although this point is little worth discussing given the Court's other findings, NMSA § 29-7-6(A)(7) applies to *applicants*' qualifications for certification. Whether or not the Defendant officers were qualified applicants *at the time of hiring* is of limited relevance for the same reasons discussed with respect to their psychological fitness to serve. *See* pg. 7, *supra*.

Consequently, Plaintiffs' requested discovery fails the proportionality analysis on this theory as well.

C. <u>Racist Tendencies</u>

Third, the Court finds that the subpoenaed psychological evaluations are not proportional to the needs of the case as they relate to the Defendant officers' "racist tendencies." Unlike their generalized moral character, whether or not the Defendant officers have behaved in a racially discriminatory manner in the past has obvious relevance to Plaintiffs' claims of racial discrimination. However, to this Court's knowledge, not one of the clinical evaluations included in HPD's pre-employment psychological evaluations is specifically designed to measure an applicant's racial bias. *See supra* n. 3–5. Nor have Plaintiffs made such an argument. At the very least, therefore, Plaintiffs' subpoena is dramatically overbroad: it covers a wide swath of highly sensitive psychological information, most of which is obviously irrelevant to showing racial bias or discrimination, on the bare chance that some information related to racial bias will be revealed.

In addition, once again, the temporal distance between some of the Defendant officers' evaluations and any events that transpired during Plaintiffs' employment period weighs against a finding of proportionality. *See, e.g., Ray v. Ropes & Gray LLP*, 799 F.3d 99, 116 (1st Cir. 2015) (probative value of racially derogatory remarks is "circumscribed if they were made in a situation temporally remote from the date of the

employment decision in question"); *Antonio v. Sygma Network, Inc.*, 458 F.3d 1177, 1184 (10th Cir. 2006) (no inference of pretext was reasonable where a racial comment was "temporally remote from the termination").

For these reasons, the Court does not find that discovery of the subpoenaed psychological evaluations would be proportional to the needs of this case on a theory of demonstrating racial bias.

D. Credibility and Impeachment

Lastly, Plaintiffs argue that the subpoenaed psychological evaluations are relevant for the general purposes of impeachment and establishing credibility. Plaintiffs assert that "credibility is *always* relevant." *Doc. 164* at 3 (emphasis in original). So far as it goes, this statement is not inaccurate. For example, "[a] witness's credibility may always be attacked by showing that his or her capacity to observe, remember, or narrate is impaired." *United States v. Robinson*, 583 F.3d 1265, 1272 (10th Cir. 2009) (quoting 4 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence, § 607.05[1] (Joseph M. McLaughlin ed., 2d ed. 2009)). Likewise, proof of bias against a particular party is "almost always relevant" in weighing a witness's credibility. *United States v. Abel*, 469 U.S. 45, 52 (1984).

However, the mere fact that information, if found, would be relevant does not automatically make every file in which it might be found, discoverable. *See* Fed. R. Civ. P. 26(b)(1) (discoverable information must be both relevant *and* proportional).

Moreover, there must be some limit to the general purposes of establishing credibility and gathering information for impeachment. They would otherwise justify nearly unlimited discovery with respect to every witness or party in every case. Plaintiffs do not explain in what specific ways the Defendant officers' pre-employment psychological evaluations could be used to measure their credibility or impeach them as witnesses. *See generally doc. 164*. In short, without more, arguing that the subpoenaed records "may discover statements which could be used for impeachment," or "may discover evidence of a character for truthfulness," *doc. 164* at 3, is inadequate to establish that the discovery of these highly personal psychological evaluations is proportional to the needs of the case.

IV. **CONCLUSION**

In light of the foregoing, Defendants' Motion to Quash Subpoena Issued by Plaintiffs to Zia Consulting, Inc. and for Protective Order (*doc. 161*) is hereby GRANTED.

_____
GREGORY B. WORMUTH
UNITED STATES MAGISTRATE JUDGE