IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

BRANDON ELLIS,
JEREMY ARTIS,
VASSHAWN ROBINSON,

      Plaintiffs,

vs.                                                                          Case No. 2:17-cv-01011 KWR/GBW

HOBBS POLICE DEPARTMENT,
JASON HERRERA, CHAD WRIGHT,
SHANE BLEVINS, JEREMY KIRK,
MATTHEW BURLESON, JIMMY GRIMES,
CHRISTOPHER MCCALL, J.J. MURPHY,

      Defendants.

## MEMORANDUM OPINION AND ORDER

THIS MATTER comes before the Court upon Defendants' Motion for Summary Judgment on Plaintiff Artis' Claims, filed on November 21, 2019 (**Doc. 185**).  Having reviewed the parties' pleadings and the applicable law, the Court finds that Defendants' motion is well-taken in part and, therefore, is **GRANTED IN PART** and **DENIED IN PART.**

## BACKGROUND

This case arises out of Plaintiffs' opposition to racial discrimination within the Hobbs Police Department.  Plaintiff Artis, a white male, alleges he was retaliated against for (1) opposing HPD's racial discrimination against Plaintiff Robinson and (2) opposing alleged discriminatory police practices against African Americans.  Defendants include Hobbs Police Department, Chief McCall, and several supervisors and officers.

Plaintiff filed this case under 42 U.S.C. § 1981 and 1983, and the New Mexico Whistleblower Protection Act.  Plaintiff's complaint asserts the following claims:

Count I:  New Mexico Whistleblower Protection Act

Count II:  First Amendment Retaliation under § 1983; and

Count III: Racial Discrimination pursuant to § 1981.

Defendants moved for summary judgment on all claims asserted by Plaintiff Artis.  **Doc. 185.**

## LEGAL STANDARD

Defendants did not raise qualified immunity.  Therefore, the Court will analyze the motion under normal summary judgment principles.  A motion for summary judgment is appropriate when there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). As the Tenth Circuit has explained, "mere assertions and conjecture are not enough to survive summary judgment." *York v. AT&T*, 95 F.3d 948, 955 (10th Cir. 1996).  To avoid summary judgment, a party "must produce specific facts showing that there remains a genuine issue for trial and evidence significantly probative as to any [material] fact claimed to be disputed."  *Branson v. Price River Coal Co.*, 853 F.2d 768, 771-72 (10th Cir. 1988) (quotation marks and citations omitted).

"A fact is material if, under the governing law, it could have an effect on the outcome of the lawsuit. A dispute over a material fact is genuine if a rational jury could find in favor of the

nonmoving party on the evidence presented." *Dewitt v. Sw. Bell Tel. Co.*, 845 F.3d 1299, 1306 (10th Cir. 2017) (quotation marks and citation omitted).

## UNDISPUTED FACTS

The Court takes the facts in the light most favorable to Plaintiff. Although Defendants ably disputes Plaintiff's facts, the Court finds the following facts well-supported in the record. Factual assertions not specifically controverted or disputed are deemed admitted. To the extent a party does not cite to the record to support a fact or dispute a fact, the Court disregards that factual assertion or dispute. Fed. R. Civ. P. 56(c)(1); D.N.M.LR-Civ. 56-1(b) ("All material facts set forth…will be deemed undisputed unless specifically controverted.")

### A.    Background.

In 2013, Plaintiff Artis and Plaintiff Robinson became friends while they both served in the United States military at Fort Campbell, Kentucky. They both took jobs with the Hobbs Police Department ("HPD"). Plaintiff Artis was employed with HPD from about February 22 to May 27, 2016.

Plaintiff does not recall that HPD trained him that racial discrimination or harassment was improper or that there was any written reporting mechanism. He was trained that complaints were handled in-house and informally and advised if he had problems to bring it up with his Field Training Officer ("FTO").

Plaintiff Artis told FTO Arvin Sanjideh that he was being mocked by his shift and that he had witnessed Plaintiff Robinson being harassed by other officers. Sgt. Barrientes was present while officers mocked and ridiculed Plaintiff Artis for his relationship with Plaintiff Robinson, who is African American.

Specifically, Plaintiff Robinson had left HPD for the Lea County Sherriff's Office.  Both plaintiffs had objected to alleged discriminatory policing by HPD.  Sgt. Barrientes and several other officers would talk about Plaintiff Robinson and tell Plaintiff Artis that he did not need to be like him on patrol and that he needed to do what he was told.  Plaintiff Artis was a target of distain because of his friendship with Plaintiff Robinson.  One day in Sgt. Barrientes' office, several officers asked whether he intended to leave to go to Lea County Sheriff Office like Plaintiff Robinson.  Officer Kirk told Plaintiff that his military service "doesn't mean jack."  Officer Grimes said something similar.

## B.      Plaintiff reported improper or unlawful activities.

Plaintiff asserts he observed apparent unlawful or improper activity in HPD, including racially discriminatory policing.  Plaintiff reported to FTO Sanjideh that he had witnessed Defendant Kirk use his K9 to coerce an African American driver into giving consent to search his car for rugs.  Plaintiff believed that Kirk had coerced a motorist into a search of his car and his actions constituted an illegal search.  FTO Sanjideh told Plaintiff Artis that he would speak with Officer Kirk and his Sergeant about the incident.  Plaintiff was not interviewed about this incident with internal affairs and believes Officer Kirk was not held accountable.

In another instance, Plaintiff was on patrol with FTO Sanjideh.  They made a vehicle welfare stop of two African American males in a predominantly African American neighborhood.  No crime had occurred, and they were sitting in their car outside their home.  Plaintiff objected to the need to make a second contact and arrest.  Plaintiff raised his concern to FTO Sanjideh that the second approach was unnecessary and it was unconstitutional to go onto private property for no reason.  They arrested one of the men, who was placed in the patrol unit without a seat belt.

Plaintiff asserts this caused the arrestee to be thrown around the backseat as they quickly responded to another call.

Based on his personal observation as an officer and through radio traffic and CAD logs, Plaintiff believed his FTO would not have made the second approach if they had been white males. Plaintiff Artis had seen and heard over the radio a pattern where HPD officers focus their patrols on African American communities to make pedestrian in the roadway stops.  He observed that the African American community was targeted by patrol officers for "stats" on stops.  Plaintiff also observed that Plaintiff Robinson was disciplined more harshly than other officers and spoken to in an abusive and unprofessional manner.

Plaintiff shared his concerns about HPD's discriminatory policing with Plaintiff Robinson and Plaintiff Ellis, who shared their collective concerns with NAACP representative Joseph Cotton.

FTO Sanjideh, Plaintiff's supervisor, called him a pedophile.  Plaintiff asserts it was based on the appearance of his African American fiancée.

Plaintiff asserts he was belittled and mocked for wanting to see change in HPD.  He asserts that this environment meant he could not trust his FTOs or supervisors. Plaintiff believes that informal reporting through one's direct supervisor created a hostile work environment for those reporting misconduct.

### C.    Employment Prospects.

Plaintiff applied for a position with the Lea County Sherriff's Office without telling anyone at HPD.  He was hired for the position.  On September 5, 2016, Plaintiff Artis was almost arrested following an argument with his fiancée.  Although the New Mexico State Police had already arrived, HPD Officer Grimes showed up at the scene. Officer Grimes attempted to get a warrant

for Plaintiff's arrest, even though the New Mexico State Police were already investigating. Officer Grimes would report to other trainees that Plaintiff Artis is "a piece of shit, he couldn't cut it as a real cop; he doesn't know what he's doing; he's a bad influence." **Ex. 23 at 228.**

Plaintiff applied to the Sandoval County Sheriff's Office and the Santa Fe County Sheriff's Office. Plaintiff appears to assert he was given a negative reference by HPD. **Ex. 24 at ¶ 43-52.** He was also denied a position by HPD on the on a joint task force, even though his employer, the Lea County Sheriff's Office, supported him. ***Id.***

## DISCUSSION

### I.      Plaintiff's Affidavit.

Defendants argue that Plaintiff Artis' affidavit (**Ex. 24**) should be disregarded because it conflicts with his deposition testimony and creates sham issues of fact. "[A]n affidavit may not be disregarded [solely] because it conflicts with the affiant's prior sworn statements. In assessing a conflict under these circumstances, however, courts will disregard a contrary affidavit when they conclude that it constitutes an attempt to create a sham fact issue." *Franks v. Nimmo,* 796 F.2d 1230, 1237 (10th Cir. 1986) (citation omitted). "[C]ases in which an affidavit raises but a sham issue [are] unusual." *Law Co. v. Mohawk Const. & Supply Co.*, 577 F.3d 1164, 1169 (10th Cir. 2009).

In determining whether an affidavit creates a sham fact issue, the Court considers whether: "(1) the affiant was cross-examined during his earlier testimony; (2) the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence; and (3) the earlier testimony reflects confusion which the affidavit attempts to explain." *Ralston v. Smith & Nephew Richards, Inc.,* 275 F.3d 965, 973 (10th Cir. 2001) (quotation omitted).

The affidavit and testimony are consistent that directly after the alleged discriminatory incidents, Plaintiff only reported to his direct supervisor, FTO Sanjideh.  In the affidavit, Plaintiff also asserted that he reported the alleged discrimination to Sgt. Barrientes in April or May 2016. **Ex. 24 at ¶ 17.**  The testimony omits whether or not Plaintiff reported concerns in April or May of 2016 of discriminatory treatment within the department and discriminatory policing.  Based on the record before the Court, it appears that there is nothing directly contradictory to paragraph 17 of the affidavit in Plaintiff's testimony.

Even if the testimony directly conflicted with the affidavit, the Court is not inclined to find a sham fact issue, given that the majority of the deposition was conducted by Defense counsel. The Court notes that it does not have the full transcript of the deposition.  It is unclear whether Plaintiff's counsel examined Plaintiff on this matter.  Rather, the Court finds that the affidavit clarifies confusion in the testimony or addresses matters that were unaddressed by Defense counsel.

II.      **Genuine Dispute of Material Fact Exists as to Plaintiff's New Mexico Whistleblower Protection Act Claim (Count I).**

Plaintiff asserts a New Mexico Whistleblower Protection claim solely against Defendant HPD.   Defendant HPD argue that Plaintiff's WPA claim fails because he (1) cannot make out a *prima facie* case of WPA retaliation and (2) cannot show constructive discharge.  As to the *prima facie* case, Defendant specifically argues that Plaintiff cannot show (1) an adverse employment action or (2) a causal relationship between his protected reporting and any adverse employment action.

The New Mexico Whistleblower Protection Act protects public employees who engage in certain protected activity. N.M. Stat. Ann. § 10-16C-1 *et al.*  As relevant here, the WPA protects

an employee who (1) communicates to the public employer or *third party* about an action that the public employee believes in good faith constitute san unlawful or improper act; and (2) objects to or refuses to participate in an activity, policy, or practice e that constitutes an unlawful or improper act.  N.M. Stat. Ann. § 10-16C-3(A) and (C).

To state a *prima facie* case under the NMWPA, a plaintiff must establish "three elements: (i) the employee engaged in a protected disclosure; (ii) the employer took an adverse employment action against the employee; and (iii) a causal connection exists between the protected disclosure and the adverse action." *Walton v. N.M. State Land Office*, 113 F. Supp. 3d 1178, 1199 (D.N.M. 2015) (citing N.M. Stat. Ann. § 10-16C-3) (subsequent citation omitted), *quoted in Hartigan v. Cty. of Guadalupe*, No. CV 17-0537 RB/GJF, 2017 WL 4773268, at \*4 (D.N.M. Oct. 20, 2017).

Initially, the parties dispute whether (1) *McDonnell-Douglas* framework applies, and whether (2) Plaintiff must show constructive discharge.  First, the Court need not decide whether *McDonnell-Douglas* applies, because Defendant HPD only challenged whether Plaintiff could make a *prima facie* showing.

Second, as explained below, the statute defines a retaliatory action as "any discriminatory or adverse employment action against a public employee in the terms and conditions of public employment." NMSA § 10-16C-2(D).  This language does not require Plaintiff to show a constructive discharge.

The New Mexico Legislature enacted the WPA "to encourage employees to report illegal practices without fear of reprisal by their employers." *Janet v. Marshall,* 2013-NMCA-037, ¶ 21, 296 P.3d 1253 (internal quotation marks and citation omitted). "The WPA was modeled after its federal counterpart." *Wills v. Bd. of Regents of Univ. of N.M.,* 2015-NMCA-105, ¶ 19, 357 P.3d

453 (citing 5 U.S.C. § 2302(b)(8) (2013)), *quoted in Kakuska v. Roswell Indep. Sch. Dist.,* 2019 WL 2103358, at *2 (N.M. Ct. App. Apr. 16, 2019).

The New Mexico WPA was enacted in 2010, and no New Mexico Supreme Court case answers the questions presented.  "When New Mexico cases do not directly answer the question presented, we look for guidance in analogous law in other states or the federal system." *Wills v. Bd. of Regents of Univ. of New Mexico*, 2015-NMCA-105, ¶ 19, 357 P.3d 453, 457, *CIT Grp./Equip. Fin., Inc. v. Horizon Potash Corp.,* 1994–NMCA–116, ¶ 6, 118 N.M. 665, 884 P.2d 821. The WPA was modeled after its federal counterpart.  *Willis*, 357 P.3d at 457.  "Accordingly, cases interpreting the federal whistleblower law have persuasive value in considering the legislative intent behind the WPA."  *Id., citing Trujillo v. N. Rio Arriba Elec. Coop., Inc.,* 2002–NMSC–004, ¶ 8, 131 N.M. 607, 41 P.3d 333 (recognizing that, when New Mexico statutes are similar to their federal counterparts, appellate courts may rely on federal jurisprudence in construing legislative intent).  Therefore, the Court looks to federal retaliation cases interpreting the phrase "adverse employment action."

### A.     Protected Activity.

Defendant HPD does not dispute, as to this motion only, that Plaintiff engaged in a protected activity.  **Doc. 185 at 6.**  However, Defendant argues in its reply that Plaintiff testified he never reported to Sgt. Barrientes his concerns about racial discrimination.  In an affidavit, Defendant does not cite to any case providing that reporting to a Sergeant instead of one's direct superior is required to state a whistleblowing claim.  Rather, Plaintiff testified that he was instructed to report to his direct superior, FTO Sanjideh.

The Court concludes that the record shows that Plaintiff reported to his direct superior, FTO Sanjideh, and to Sgt. Barrientes.  Plaintiff also stated he and Plaintiff Robinson reported the

alleged discrimination to a third party, Joe Cotton at the NAACP.  **Ex. 24 at ¶ 21.**  This is a protected activity under NMSA § 10-16C-3(A).  Moreover, the record reflected that actions were taken against him because he refused to participate in unlawful or improper acts.  Refusal to participate in unlawful or improper acts constitutes protected conduct.   NMSA § 10-16C-3(C).

### B.      Adverse Employment Action and Causality.

Defendant HPD argues that Plaintiff failed to show an adverse employment action or a causal connection with Plaintiff's protected conduct.  Defendant specifically argues that Plaintiff failed to show he was constructively discharged.  As Plaintiff argues, constructive discharge is not required under the New Mexico WPA.

Rather, under the WPA, retaliatory action includes "taking any discriminatory or adverse employment action against a public employee in the terms and conditions of public employment." NMSA 10-16C-2(D).  The Court may look to federal retaliation cases interpreting that phrase "adverse employment action." The courts "liberally define[ ] the phrase adverse employment action" and do not limit such actions to "monetary losses in the form of wages or benefits." *Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 532 (10th Cir. 1998) (citation and quotation marks omitted).  The Court may consider acts that carry "a significant risk of humiliation, damage to reputation, and a concomitant harm to future employment prospects." *Berry v. Stevinson Chevrolet,* 74 F.3d 980, 986 (10th Cir.1996) (holding that the filing of false criminal charges against former employee constituted an adverse employment action because of its potential to harm future employment prospects); *Annett v. Univ. of Kansas*, 371 F.3d 1233, 1239 (10th Cir. 2004). A strong indicator that a challenged employment action is adverse "is that the action causes harm to future employment prospects." *Hillig v. Rumsfeld*, 381 F.3d 1028, 1031 (10th Cir. 2004), *quoted in Braxton v. Nortek Air Sols., LLC*, 769 F. App'x 600, 605 (10th Cir. 2019).  "Coworker hostility

or retaliatory harassment constitutes an adverse employment action only if it is sufficiently severe." *Medina v. Income Support Div., New Mexico*, 413 F.3d 1131, 1136–37 (10th Cir. 2005).

Plaintiff was harassed and his employment threatened, either by his superiors or by his coworkers in the presence of his superiors. While employed with HPD, Plaintiff cites to the following incidents that created adverse employment action: (1) Officers Kirk and Grimes retaliated or harassed him; (2) he felt secluded from the rest of his shift, and (3) his police reports were under more scrutiny. Specifically, Plaintiff asserts that after he made a protected report, Sgt. Barrientes brought him and his shift into her office, and he was asked whether he was going to leave the department like Plaintiff Robinson. He was told not to act like Plaintiff Robinson in his policing practices and to do what he was told. Given that Plaintiff had reported to FTO Sanjideh and Barrientes his concerns, a reasonable jury could conclude that Sgt. Barrientes allowed his shift to threaten his job and tell him to stop opposing discriminatory practices. Elsewhere in the response, Plaintiff notes that (1) FTO Sanjideh called him a pedophile and (2) members of his shift disrespected his military service. Taken together, a reasonable jury could conclude that Plaintiff's reputation was damaged and his employment was threatened because he reported to FTO Sanjideh or Sgt. Barrientes his concerns about discriminatory police practices and harassment in the department. A reasonable jury could conclude that Defendant HPD took an adverse employment action against Plaintiff because of his protected conduct.

More importantly, however, Plaintiff's future employment prospects were clearly damaged after he left HPD. Tenth Circuit law is clear that an employer may not retaliate against former employees by damaging future employment prospects or providing a negative reference. *Berry v. Stevinson Chevrolet*, 74 F.3d 980, 986 (10th Cir. 1996) (adverse employment action where criminal charges filed against former employee even after employee had been terminated), *cited*

11

*in Hillig v. Rumsfeld*, 381 F.3d 1028, 1032 (10th Cir. 2004).  A retaliation statute such as the

NMWPA would lack any teeth if its reach ended once the employment relationship ended.

Here, Plaintiff asserted facts showing that HPD or Chief McCall (1) denied him a position

on a joint task force and (2) provided negative references that caused him to lose two separate

positions with Sandoval County Sherriff's Office and Santa Fe County Sheriff's Office.  In

contrast, Plaintiff had no trouble obtaining employment when he kept his application to Lea

County Sheriff Department secret from HPD.  **Ex. 24 at ¶¶ 43-52.**[1]  A reasonable jury could

conclude that Defendant HPD or Chief McCall harmed Plaintiff's future employment prospects

and took an adverse employment action against him in retaliation for his protected conduct.

Sgt. Barrientes also instructed HPD Officer Grimes to respond to alleged domestic dispute

at Plaintiff's home.  Officer Grimes attempted to get an arrest warrant for Plaintiff, even though

HPD's involvement was a conflict of interest and the New Mexico State Police were already

involved and handling the situation.  *See* **Ex. 23 at 216-217; 222-223**.

The Court concludes that Plaintiff has created a genuine dispute of material fact as to

whether he suffered an adverse employment action because of his protected conduct.

### III.     Count II: First Amendment Retaliation Claim.

Plaintiff also asserts a First Amendment Retaliation claim under § 1983.  Plaintiff asserts

that Defendants violated his freedom of association with Plaintiff Robinson, and that he was

retaliated against for supporting the rights of racial minorities, opposing racial discrimination, and

opposing racially discriminatory police practices. Defendants did not assert qualified immunity,

and the Court will not *sua sponte* address it.

---

[1] Defendant HPD did not move to strike this portion of the affidavit or object to it.

The parties both analyze this claim under the *Worrell* standard.  *Worrell v. Henry*, 219 F.3d 1197 (10th Cir. 2000).  Thus, the Court assumes they both concede that the *Garcetii/Pickering* test does not apply.[2]

Under *Worrell*, the parties agree that Plaintiff must show (1) that he was engaged in a constitutionally protected activity; (2) that Defendants caused him to suffer an injury that would chill a person of ordinary firmness from continuing to engage in the constitutionally protected activity; and (3) that Defendants' actions were motivated by Plaintiff Artis' protected activity.  *Id.* at 1212.

Defendants challenge the first two elements, asserting that (1) Plaintiff did not engage in constitutionally protected activity and (2) Plaintiff did not suffer an injury that would chill a person of ordinary firmness from continuing to engage in the protected activity.

Defendants primarily argue that acquaintanceships or co-worker relationships are not protected by the right to association under the First Amendment.  The Court finds Defendants' argument well-reasoned and well-researched.  Plaintiff's testimony does not even establish a close friendship with Plaintiff Robinson.  Rather, Plaintiff Artis and Robinson testified that they were not especially close.  **Ex. A at 37:10-13; Ex. G at 37:13-16** ("we knew each other.  We had some beers outside sometimes, hung out. We were fine.").  Therefore, Plaintiff's First Amendment claim

---

[2] "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes." *Garcetti v. Ceballos* 547 U.S. 410, 421, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006); *Salazar v. City of Commerce City*, 535 F. App'x 692, 700 (10th Cir. 2013).  The *Garcetti*/*Pickering* test governs First Amendment retaliation claims filed by public employees. The test consists of five steps: "(1) whether the speech was made pursuant to an employee's official duties; (2) whether the speech was on a matter of public concern; (3) whether the government's interests, as employer, in promoting the efficiency of the public service are sufficient to outweigh the plaintiff's free speech interests; (4) whether the protected speech was a motivating factor in the adverse employment action; and (5) whether the defendant would have reached the same employment decision in the absence of the protected conduct."
*Trant v. Oklahoma*, 754 F.3d 1158, 1165 (10th Cir. 2014) (quoting *Dixon v. Kirkpatrick*, 553 F.3d 1294, 1302 (10th Cir. 2009)). The first three steps concern questions of law for the courts, and the last two concern questions of fact. *Id.*

for right to association should be dismissed.  *See, e.g., Copp v. Unified Sch. Dist. No. 501*, 882 F.2d 1547, 1551 (10th Cir. 1989) (right to associate did not cover friendship between government employees, which was not the type of "intimate human relationships" designed to be protected by right to associate), *citing Grossart v. Dinaso,* 758 F.2d 1221, 1232 n. 16 (7th Cir.1985) (right to associate does not include emotional bonds between public employees).

However, Plaintiff asserts that this claim should not be dismissed because he was in an interracial friendship with Robinson.  Plaintiff primarily cited to *Patrick v. Miller*, 953 F.2d 1240, 1250 (10th Cir. 1992).

In *Patrick v. Miller*, the plaintiff was a Caucasian male who was terminated in retaliation for supporting a female African-American co-worker who filed a complaint of racial discrimination against a municipality.  *Id.*  The Tenth Circuit held that (1) speech opposing a government employer's racial discrimination towards a colleague was protected conduct under a § 1983 First Amendment Speech retaliation claim and (2) retaliatory actions against a white employee because of his efforts to defend the rights of racial minorities may violate the employee's rights under § 1981.  *Patrick v. Miller*, 953 F.2d 1240, 1250 (10th Cir. 1992).

*Patrick*, however, does not address a First Amendment Retaliation Freedom of Association claim under § 1983.  Plaintiff has not cited to any case protecting freedom of association claims between interracial coworkers under § 1983.  Therefore, Plaintiff has not cited to any relevant cases to oppose dismissal of the First Amendment association claim.  The association claim is dismissed.

Plaintiff assert that he has standing to assert a First Amendment association claim under § 1981.  **Doc. 206 at 13**.  However, § 1981 is a substantive statute providing a cause of action for certain racial discrimination.  First Amendment and § 1981 claims are distinct substantive claims.

14

However, Plaintiff's First Amendment retaliation claim under § 1983 may be more appropriately characterized as a speech claim. The Court notes that Plaintiff characterizes Count II of the complaint as an association and free speech claim. **Doc. 1 at ¶ 167.**

Plaintiff asserted that he engaged in constitutionally protected opposition to HPD's racially discriminatory practices. Plaintiff's response in opposition to dismissal focused largely focused on the argument that he was retaliated against for opposing racial discrimination. **Doc. 206 at 13-14.** Defendants did not address this characterization in their reply. Because it appears that Plaintiff *may* have a valid free speech claim under *Patrick* and Defendants do not specifically seek to dismiss the free speech claim, the Court declines to *sua sponte* dismiss such claim.

Moreover, the Court does not see anything in the motion or record mandating *sua sponte* dismissal of the free speech claim. However, the Court will not *sua sponte* rule on the viability of the free speech claim without briefing and an appropriate record by the parties.[3]

### III.    Count III: Section 1981 racial discrimination.

Defendants sought summary judgment as to procedural due process and equal protection claims under § 1983. Plaintiff Artis did not respond to those arguments, therefore the Court assumes that he does not assert § 1983 equal protection or due process claims.

Defendants also sought summary judgment as to Plaintiff Artis' § 1981 racial discrimination claim. Plaintiff appears to assert this claim against Chief McCall for creating a hostile work environment.

Section 1981 provides that all persons "shall the have same right… to make and enforce contracts… as is enjoyed by white citizens." § 1981. It authorizes "a plaintiff to bring a claim for

---

[3] For example, the parties agree the *Worrell* standard applies to the association claim, but it is unclear if they would agree that standard applies to a free speech claim.

hostile work environment based on unlawful race discrimination." *Lounds v. Lincare, Inc.,* 812 F.3d 1208, 1221 (10th Cir. 2015).

Under § 1981, to assert a prima facie case of racial harassment/hostile work environment, Plaintiff must show that "under the totality of the circumstances (1) the harassment was pervasive or severe enough to alter the terms, conditions, or privilege of employment, and (2) the harassment was racial or stemmed from racial animus." *Bolden v. PRC Inc.,* 43 F.3d 545, 551 (10th Cir.1994) (internal citations omitted). He must demonstrate "that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *McCowan v. All Star Maint., Inc.,* 273 F.3d 917, 923 (10th Cir.2001) (internal quotations and citations omitted).

"The same substantive standards apply to a hostile work environment claim regardless of whether the plaintiff has brought it under § 1981 or Title VII." *Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1221 (10th Cir. 2015), *citing Aramburu v. Boeing Co.,* 112 F.3d 1398, 1410 (10th Cir. 1997). Accordingly, the Court may look to case law interpreting Title VII claims. *Id.* This standard is more difficult for a plaintiff to overcome than under the First Amendment. *Couch v. Bd. of Trustees of Mem'l Hosp. of Carbon Cty.*, 587 F.3d 1223, 1237 (10th Cir. 2009). To carry his burden Plaintiff must establish the following elements:

> "(1) [he] is a member of a protected group; (2) [he] was subject to unwelcome harassment; (3) the harassment was based on [race]; and (4) [due to the harassment's severity or pervasiveness], the harassment altered a term, condition, or privilege of the plaintiff's employment and created an abusive working environment.

*Lounds v. Lincare, Inc.,* 812 F.3d 1208, 1222 (10th Cir. 2015).

As noted above, Plaintiff must show that the "harassment was racial or stemmed from racial animus." *Bolden v. PRC Inc.,* 43 F.3d 545, 551 (10th Cir.1994), *quoted in Mitchell v. City & Cty.*

16

*of Denver*, 112 F. App'x 662, 671 (10th Cir. 2004).   "[T]he existence of [racial] harassment must

be determined 'in light of the record as a whole,' and the trier of fact must examine the totality of

the circumstances, including 'the context in which the alleged incidents occurred.' "  *McCowan v.*

*All Star Maint., Inc.*, 273 F.3d 917, 925 (10th Cir. 2001) (internal citations and quotation marks

omitted).   The court considers "a variety of factors" in this holistic analysis, "including[ ] the

frequency of the discriminatory conduct; its severity; whether it is physically threatening or

humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an

employee's work performance." *Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1222 (10th Cir. 2015).

In his response, Plaintiff asserts a number of facts relating to a hostile work environment

for African Americans – including multiple uses of racial slurs and statements about jailing African

Americans.   However, Plaintiff does not explain how this created a work environment hostile to

Plaintiff based on his Caucasian race.   Although the environment may have been hostile to African

Americans, the case law cited above clearly refers to a hostile work environment created through

racial discrimination or animus.   Whatever adverse employment actions Plaintiff faced, it was not

based on racial discrimination or animus toward Caucasians.   *Payan v. United Parcel Serv.*, 905

F.3d 1162, 1170 (10th Cir. 2018), *quoting Sandoval v. City of Boulder*, 388 F.3d 1312, 1326-27

(10th Cir. 2004) (plaintiff required to "produce evidence from which a rational jury could infer

that [ ]he was targeted for harassment because of h[is] …race…."); *Lounds v. Lincare, Inc.*, 812

F.3d 1208, 1221 (10th Cir. 2015) (reciting law discussing racial animus or racial discrimination).

Plaintiff has not cited to any case providing that a white plaintiff may state a claim under

§ 1981 for an environment hostile to African Americans.   Plaintiff cites to *Patrick*, *supra,* in which

a white male was able to state a claim for racial discrimination under § 1981 for supporting an

African American coworker's racial discrimination claim.   *See also Phelps v. Wichita Eagle-*

17

*Beacon*, 886 F.2d 1262, 1267 (10th Cir. 1989) (collecting cases) ("alleged discrimination against a white person because of his association with blacks may state a cause of action under Section 1981"). However, *Patrick* does not stand for the proposition that a white person may state a clam for a work environment hostile to African Americans.

### CONCLUSION

Plaintiff created a genuine dispute of material fact as to his New Mexico Whistleblower Protection Act claim (Count I). Plaintiff's First Amendment Association claim is dismissed, but the Court does not rule on the viability of any First Amendment Speech claim (Count II). Finally, Plaintiff's claims under Count III are dismissed.

**IT IS THEREFORE ORDERED** that Defendants' Motion for Summary Judgment (**Doc. 185**) is **GRANTED IN PART** and **DENIED IN PART.**

KEA W. RIGGS
UNITED STATES DISTRICT JUDGE