# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

―――――――――――――

BRANDON ELLIS,
JEREMY ARTIS,
VASSHAWN ROBINSON,

      Plaintiffs,

vs.                                          Case No. 2:17-cv-01011 KWR/GBW

HOBBS POLICE DEPARTMENT,
JASON HERRERA, CHAD WRIGHT,
SHANE BLEVINS, JEREMY KIRK,
MATTHEW BURLESON, JIMMY GRIMES,
CHRISTOPHER MCCALL, J.J. MURPHY,

      Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

THIS MATTER comes before the Court upon Defendants' Motion for Summary Judgment on Plaintiff Ellis' Claims, filed on November 21, 2019 (**Doc. 186**).  Having reviewed the parties' pleadings and the applicable law, the Court finds that Defendants' motion is well-taken in part and, therefore, is **GRANTED IN PART** and **DENIED IN PART.**

## BACKGROUND

This case arises out of alleged racial discrimination in the Hobbs Police Department ("HPD") and retaliation for Plaintiffs' opposition to racial discrimination within the Hobbs Police Department.  Plaintiff Ellis, a former HPD Officer, alleges he was retaliated against for (1) opposing HPD's racial discrimination and (2) opposing alleged discriminatory police practices against African Americans.  Defendants include Hobbs Police Department, Chief McCall, and several supervisors and officers.

Plaintiff filed this case under 42 U.S.C. § 1981 and 1983, and the New Mexico Whistleblower Protection Act.  Plaintiff's complaint asserts the following claims:

Count I:  New Mexico Whistleblower Protection Act

Count II:  First Amendment Retaliation under § 1983; and

Count III: Racial Discrimination pursuant to § 1981.

Defendants moved for summary judgment on all claims asserted by Plaintiff Ellis.  **Doc. 186.**

## LEGAL STANDARD

Defendants did not raise qualified immunity.  Therefore, the Court will analyze the motion under normal summary judgment principles.  A motion for summary judgment is appropriate when there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986). As the Tenth Circuit has explained, "mere assertions and conjecture are not enough to survive summary judgment." *York v. AT&T*, 95 F.3d 948, 955 (10th Cir. 1996).  To avoid summary judgment, a party "must produce specific facts showing that there remains a genuine issue for trial and evidence significantly probative as to any [material] fact claimed to be disputed."  *Branson v. Price River Coal Co*., 853 F.2d 768, 771-72 (10th Cir. 1988) (quotation marks and citations omitted).

"A fact is material if, under the governing law, it could have an effect on the outcome of the lawsuit. A dispute over a material fact is genuine if a rational jury could find in favor of the

nonmoving party on the evidence presented." *Dewitt v. Sw. Bell Tel. Co.*, 845 F.3d 1299, 1306 (10th Cir. 2017) (quotation marks and citation omitted).

## UNDISPUTED FACTS[1]

The Court finds the following material facts well-supported in the record[2], and Defendants have not shown that the "materials cited [by Plaintiff] do not establish the [] presence of a genuine dispute, or that [Plaintiff] cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1)(B).

### A.    **Hobbs Police Department.**

"Hobbs… has been involved in a number of legal actions challenging the conduct of its police department."  *Marshall v. Columbia Lea Reg'l Hosp.*, 345 F.3d 1157, 1179 n.13 (10th Cir. 2003) (collecting cases); Plaintiff's Additional Material Fact A ("**AMF A**").  These cases include allegations that African American residents have been arrested, subjected to force, and subjected to investigative detentions in numbers greater than their percentage in the community. *Johnson v.*

---

[1] Plaintiff has referred to one of his expert reports, William S. Cooper. **Doc. 188-2.**  Defendants have not challenged with specificity the use of that report in this summary judgment motion, therefore the Court concludes any objection is waived.

Defendants object that some statements are hearsay.  However, the Court concludes that statements by officers or supervisors of the Hobbs Police Department are party-opponent statements.  FRE 801(d)(2).  The officers, even if not defendants, are agents of Defendant HPD or the City of Hobbs.

[2] Defendants object to Plaintiff's AMF M, asserting that the lapel video was not authenticated.  AMF M refers to the lapel video from Officer Jenna Ford capturing that she complained to another officer about how rap music "reminds me of every black inmate that's locked up…. I can't enjoy it because it reminds me of them… fuckin' pieces of shit." AMF M.  The Court finds that the video is authenticated. Fed. R. Evid. 901 provides: "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."  No authenticating affidavit is required.  *Law Co. v. Mohawk Const. & Supply Co.*, 577 F.3d 1164, 1171 (10th Cir. 2009) ("Because no authenticating affidavit is required…the district court committed an error of law by categorically discarding these exhibits and therefore abused its discretion.").  The Court may take into consideration the appearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances.  FRE 901(b)(4).  Viewing the video, it appears that the video was produced by the City of Hobbs, New Mexico, and is stamped with an email address from the city government of Hobbs.  The video appears to be what Plaintiff says it is.

*City of Hobbs,* 2004 WL 7337910, at *2 (D.N.M. 2004) (regarding stipulated agreement), *cited in* **AMF A**.

Around 2001, a class of plaintiffs comprised of African Americans sued the City of Hobbs based on alleged discriminatory actions of HPD officers.   The parties reached a stipulated agreement to address and prevent racial discrimination in policing.   The stipulated agreement lasted into 2007.   Defendants McCall and Blevins, as well as Deputy Chief Dunlap, Captain Cunningham and Lieutenants Miller and Wright were HPD officers during that time.   Then officer McCall was arresting African Americans in numbers three to four times greater than their population percentage in the community and conducting field interview stops four to five times greater than their percentage in the community.   **AMF B-D.**

During the stipulated agreement, Defendant Wright was counseled that his minority contacts were too high and was reassigned to a different part of Hobbs to reduce his minority contacts.   **AMF E.**   Defendant Wright has a history of making racist comments, including using the n-word.   **Doc. 205-4, Ex. 5; Doc. 205 AMF F.**   He was also "terminated" from HPD for his traffic stops against African Americans.   **Doc. 205 AMF E; Doc. 207 AMF V.**   Defendant Wright was rehired years later but was directed to stay away from the southeast portion of Hobbs due to the perception that he was targeting minorities.   **AMF G.**

When Defendant McCall became Chief of Police, he was perceived to have instituted a "buddy system" in which his friends were promoted.   **AMF I; Doc. 205, Ex. 2.**   There was a fear of repercussions and retaliations for those who reported misconduct involving Defendant McCall's favored officers.   The three Plaintiffs were not among this favored group.   **AMF I, J.**

From 2012 to 2015, Defendant Wright instituted a per-month quota for traffic stops. Officers would travel to what they understood to be African American communities.   There was

competition between shifts to see who could make the most arrests each month.  Defendant Blevins told his shift during a meeting that they were not making enough arrest and writing enough tickets, and Defendant Blevins threated to transfer or fire any officer on the shift with unsatisfactory statistics.  **AMF K, L.**  Defendant Herrera was present during this shift meeting.  **Doc. 205-1, Ex. 2.**

Officer Ford was captured on her own lapel camera as she complained to other officers about how rap music "reminds me of every black inmate that's locked up…I can't enjoy it because it reminds me of them… f***in' pieces of shit."  **AMF M.**

### B.    Plaintiff Brandon Ellis.

Plaintiff joined the HPD in August 2012 and resigned August 4, 2016.  **UMF 1.**  He was supervised by Defendants Herrera and Defendant Wright from August 2013 to August 2014, and from August 2015 to August 2016.  **AMF O.**

Plaintiff's first performance evaluation covered August 1, 2012 through June 2013.  His performance was rated as "Needs to Improve" in the areas of initiative, public relations, and verbal communication skills.  He was instructed to improve his command presence.  **UMF 2.**  In his second performance review, Defendant Herrera deemed him satisfactory, but he needed to improve his quality of work and adherence to policies and procedures.  **UMF 3**.

On August 18, 2014, Plaintiff was placed on a six-month performance improvement plan ("PIP") to address (1) two motor vehicle accidents in August and December 2013 and (2) report writing.  Plaintiff was given monthly evaluations by Defendant Herrera.  **UMF 4.**  Plaintiff was placed on the performance improvement plan approximately a year after the accidents.  **Doc. 205 at 2.**  As to his report writing, Plaintiff asserts that HPD had switched to a new system and he was

"missing boxes". Plaintiff was the only officer put on a PIP for report writing even though other officers had similar problems. **Doc. 205 at 2.**

### C.     Use of N-word in the Department.

Prior to being placed on the August 2014 performance improvement plan, Plaintiff observed Officer Berdoza, a white male, use the n-word in front of Defendant Herrera. **Doc. 205, Ex. 10, ¶ 10.** In another instance, on or around August 19, 2014, Officer Berdoza bragged his shift "had jailed a lot of (n-word) today." Defendant Herrera was present but failed to discipline Officer Berdoza. Plaintiff observed the incident. Plaintiff took it as an insult and shook his head at Officer Berdoza. Officer Berdzoa responded, "are you going to snitch?" Officer Berdoza often used the N-word in Defendant Herrera's and Plaintiff Ellis' presence. **AMF R.**

Deputy Chief Dunlap did not consider Berdoza's use of the n-word to be derogatory. **AMF S, citing Doc. 205-8, Ex. 12, at 43:1-19.** Officer Berdoza did not think it was a big deal to use the n-word to greet other officers, or to be called the n-word by other officers. **AMF S.**

Officer Berdoza was "verbally counseled" by Captain Wright, who himself has used the n-word and was previously fired for disparate policing. There was no formal reporting or reprimand of Officer Berdoza's use of the n-word. **AMF T; Doc. 205-8, Ex. 12, at 45.**

Joseph Cotton told City Manager Murphy about Berdoza's use of the N-word in the briefing room. Defendant Murphy told Defendant McCall to investigate and to find out what happened and to direct a change of action. Defendant Murphy did not follow up to see whether Berdoza was disciplined or whether anything was done to prevent it from happening again. **AMF U.**

Plaintiff had reported the Berdoza incident to Sgt. Miller and later Lt. Cunningham. Thereafter, Defendant Herrera's "overall behavior towards [Plaintiff] … changed" and their

working relationship was strained.  **AMF V.**  Defendant Herrera singled Plaintiff out over the radio for harassment; would call Plaintiff out in front of the entire police department and question him about his location and activity.  Defendant Herrera began issuing Plaintiff negative monthly PIP evaluations.  Berdoza stopped talking to Plaintiff, would not get involved when they were assigned to same call for service and mocked him.  **AMF W.**

        **D.**      **Release from Performance Improvement Plan.**

Sgt. Herrera released Ellis from his PIP on February 18, 2015 after finding that he had successfully completed the requirements of the plan.  **UMF 6**.  Lt. McEachern gave Ellis his third performance review for the period August 2014 to August 2015.  Plaintiff was rated satisfactory, except that his initiative needed to improve.  **UMF 7.**

In April of 2015, Plaintiff determined he did not have probable cause to make an arrest of an African American man preaching in public.  A responding sergeant told Plaintiff "Chad Wright said we need to find a reason to arrest" the African American preacher.  HPD removed Plaintiff from the case and assigned another officer to make the arrest.  **AMF X.**

In January 2016, Lt. Miller counseled Plaintiff Ellis for not activating his pocket recorder when he responded to a call.  Another officer on the scene who was not African American and had not reported discrimination was not written up for the same conduct.  **AMF Z.**

        **E.**      **Internal Affairs Investigation and Suspension.**

In December of 2015, Defendant Herrera identified Plaintiff Ellis as a witness in an internal affairs investigation into the misconduct of another African American officer, when in fact he had not witnessed the behavior of the African American officer.  Specifically, Sgt. Herrera alleged that Plaintiff may have had knowledge of or viewed an inappropriate video of a prisoner that another officer was sharing.  **Doc. 186-1, Ex. A at 250-51.**  Ellis denied he was a witness to the alleged

misconduct.  Plaintiff Ellis talked to another officer about the incident, against Cpt. Cunningham's orders, but denies that he knew there was an internal investigation in place.  **UMF 9.**

On February 2, 2016, Plaintiff was notified that HPD had scheduled a pre-termination meeting related to Plaintiff's violation of the confidentiality order.  **UMF 11.**  Chief McCall declined to terminate Plaintiff and issued him a 40-hour suspension without pay.  Plaintiff appealed to City Manager Murphy, who reduced the suspension to 20 hours.  **UMF 12-13.**  Plaintiff asserts he was disciplined more harshly than two other officers who also disclosed the investigation.  **Doc. 205 at 2-3**.  HPD tried to terminate Plaintiff for discussing the investigation while similarly situated white officers, including Defendant Herrera, Sgt. McEachern and Officer Berdoza also discussed and witnessed the offensive conduct at issue in the investigation and were not disciplined.  **AMF Y**.

### F.      Report to NAACP

In February 2016, Plaintiff met with local NAACP leader Joseph Cotton to report the incident involving Officer Berdoza, a racially hostile work environment and race-based policing.  **AMF AA.**  By June 2016, Mr. Cotton told Defendants McCall and Murphy about Plaintiff's Berdoza complaint, his complaints of discriminatory policing and discipline both before and after HPD made an attempt to terminate Plaintiff Ellis.  Mr. Cotton told them that Plaintiff Ellis and Robinson were the source of his information.  **AMF BB**.

In May through July 2016, Defendant Herrera increased pressure on Plaintiff Ellis to make more stops and arrests.  **AMF CC.** Defendant Wright's shift conducted stops in the east side of town even if they were not assigned to that area.  Plaintiff refused to focus on the black community and continued policing in his assigned area.  Officers who made high numbers of stops in the east

were being treated favorably by their supervisors, while defendants assigned Plaintiff Ellis to jobs no one wanted to do, such as watching an inmate at the hospital.  **AMF P.**

Defendant Herrera told Plaintiff and another officer to go to district 3 in the east side of town to conduct traffic stops, which is understood to have a larger African American community. **AMF DD[3]; Doc. 205 Ex 10 at ¶ 7-8.**  Plaintiff was specifically instructed to make stops in district 3 as opposed to district 5, which has a larger white population.  *Id.*  HPD officers tallied 438 stops in District 3 from 2016 to 2018 and only 81 stops in District 5 during that same period, although District 5 has a larger population. **AMF EE.**

**G.     Plaintiff Ellis Resigns.**

On April 26, 2016 Plaintiff passed a test making him eligible to participate in promotional process for detective at HPD.  Plaintiff believed that he would not make detective because he refused to meet HPD quotas and target African Americans.  **AMF HH, II.**

On June 28, 2016, Plaintiff Ellis had a counseling session with Defendant Herrera. Defendant Herrera asked him why he had not been doing more traffic stops.  Shortly thereafter Defendant Herrera gave Plaintiff a negative annual review.  **AMF GG.**

In July 2016 Defendant Herrera gave Plaintiff his fourth performance evaluation.  Plaintiff was told that his overall performance rating was "needs to improve". Plaintiff was told that he had to mature as an officer, improve his command presence and increase his productivity.  Defendant Herrera concluded "I look forward to working with Officer Ellis and watching him develop into a good officer."  **UMF 16.**  On July 25, 2016 Lt. McEachern gave Ellis a written reprimand for failing to activate his pocket recorder during a second use of force incident.  **UMF 17**.  Plaintiff resigned on August 1, 2016, to begin a job with Lea County Sheriff's Office.

---

[3] Defendants did not object to the use of the expert testimony cited by Plaintiff.

**DISCUSSION**

I.   <u>**Plaintiff Ellis Did Not Produce Sham Affidavit**</u>

Defendants argue that Plaintiff Ellis' affidavit (**Doc. 205, Ex. 10)** should be disregarded because it conflicts with his deposition testimony and creates sham issues of fact.  "[A]n affidavit may not be disregarded [solely] because it conflicts with the affiant's prior sworn statements. In assessing a conflict under these circumstances, however, courts will disregard a contrary affidavit when they conclude that it constitutes an attempt to create a sham fact issue." *Franks v. Nimmo,* 796 F.2d 1230, 1237 (10th Cir. 1986) (citation omitted). "[C]ases in which an affidavit raises but a sham issue [are] unusual." *Law Co. v. Mohawk Const. & Supply Co.*, 577 F.3d 1164, 1169 (10th Cir. 2009).

In determining whether an affidavit creates a sham fact issue, the Court considers whether: "(1) the affiant was cross-examined during his earlier testimony; (2) the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence; and (3) the earlier testimony reflects confusion which the affidavit attempts to explain." *Ralston v. Smith & Nephew Richards, Inc.,* 275 F.3d 965, 973 (10th Cir. 2001) (quotation omitted).

Here, Plaintiff's affidavit does not appear to directly contradict his deposition testimony. It appears that neither party has provided the Court with the full deposition testimony.  For example, Defendants specifically assert that Plaintiff admitted in his deposition testimony that he did not report the use of the n-word in the department until *after* he was placed on the performance improvement plan in August 2014.  **Doc. 217, Ex. B at 43:23-44:12.**  The Court finds that the deposition testimony reflects confusion which the affidavit attempts to explain.  The affidavit reflects a clear timeline of what occurred.

II.    **Genuine Dispute of Material Fact Exists as to Plaintiff's New Mexico Whistleblower**
**Protection Act Claim (Count I) against Defendant HPD (City of Hobbs) and Chief**
**McCall.**[4]

Plaintiff asserts a New Mexico Whistleblower Protection claim against Defendant HPD or Chief McCall in his official capacity.  Defendants argue that Plaintiff's WPA claim fails because he cannot make out a *prima facie* case of WPA retaliation.  Defendant specifically argues that Plaintiff cannot show (1) an adverse employment action or (2) a causal relationship between his protected reporting and any adverse employment action.

The New Mexico Whistleblower Protection Act protects public employees who engage in certain protected activity. N.M. Stat. Ann. § 10-16C-1 *et al.*  As relevant here, the WPA protects an employee who (1) communicates to the public employer or *third party* about an action that the public employee believes in good faith constitutes an unlawful or improper act; and (2) objects to or refuses to participate in an activity, policy, or practice that constitutes an unlawful or improper act.  N.M. Stat. Ann. § 10-16C-3(A) and (C).

To state a *prima facie* case under the NMWPA, a plaintiff must establish "three elements: (i) the employee engaged in a protected disclosure; (ii) the employer took an adverse employment action against the employee; and (iii) a causal connection exists between the protected disclosure and the adverse action." *Walton v. N.M. State Land Office*, 113 F. Supp. 3d 1178, 1199 (D.N.M. 2015) (citing N.M. Stat. Ann. § 10-16C-3) (subsequent citation omitted), *quoted in Hartigan v. Cty. of Guadalupe*, No. CV 17-0537 RB/GJF, 2017 WL 4773268, at *4 (D.N.M. Oct. 20, 2017).

---

[4] Defendant HPD asserts, for the first time in a footnote in a reply brief **(Doc. 217)** that it is not an appropriate entity. Because Plaintiff did not have the opportunity to respond or propose an appropriate remedy, the Court will not address that argument in this opinion.  Moreover, Plaintiff appears to have named Chief McCall and City Manager Murphy in their official capacity, which is a suit against the City of Hobbs.

The statute defines a retaliatory action as "any discriminatory or adverse employment action against a public employee in the terms and conditions of public employment." NMSA § 10-16C-2(D).  This language does not require Plaintiff to show a constructive discharge.

The New Mexico Legislature enacted the WPA "to encourage employees to report illegal practices without fear of reprisal by their employers." *Janet v. Marshall,* 2013-NMCA-037, ¶ 21, 296 P.3d 1253 (internal quotation marks and citation omitted). "The WPA was modeled after its federal counterpart." *Wills v. Bd. of Regents of Univ. of N.M.,* 2015-NMCA-105, ¶ 19, 357 P.3d 453 (citing 5 U.S.C. § 2302(b)(8) (2013)), *quoted in Kakuska v. Roswell Indep. Sch. Dist.,* 2019 WL 2103358, at *2 (N.M. Ct. App. Apr. 16, 2019).

The New Mexico WPA was enacted in 2010 and no New Mexico Supreme Court case answers the questions presented.  First, the Court "must ascertain and give effect to the intent of the legislature and that task beings with the language of the statute itself." *Sherman v. Klenke*, 653 Fed. App. 580, 593 (10th Cir. 2016).

Next, "[w]hen New Mexico cases do not directly answer the question presented, we look for guidance in analogous law in other states or the federal system." *Wills v. Bd. of Regents of Univ. of New Mexico*, 2015-NMCA-105, ¶ 19, 357 P.3d 453, 457, *CIT Grp./Equip. Fin., Inc. v. Horizon Potash Corp.,* 1994–NMCA–116, ¶ 6, 118 N.M. 665, 884 P.2d 821.  "Accordingly, cases interpreting the federal whistleblower law have persuasive value in considering the legislative intent behind the WPA." *Id., citing Trujillo v. N. Rio Arriba Elec. Coop., Inc.,* 2002–NMSC–004, ¶ 8, 131 N.M. 607, 41 P.3d 333 (recognizing that, when New Mexico statutes are similar to their federal counterparts, appellate courts may rely on federal jurisprudence in construing legislative intent).  Therefore, the Court looks to federal retaliation cases interpreting the phrase "adverse employment action."

### A.    Protected Activity.

Defendants do not dispute that Plaintiff engaged in a protected activity. However, the parties appear to dispute which protected activity occurred.  Plaintiff Ellis engaged in the following protected activities:

- A report to Sgt. Miller that Officer Berdoza used the n-word on August 19, 2014.
- The report to Joseph Cotton that HPD was targeting African American residents. Defendants admit that, for purpose of this motion only, the Court may infer that Chief McCall knew about Plaintiff Ellis' report to NAACP local leader Joseph Cotton. **Doc. 217 at 10 n.4.**
- Refusing to submit to department pressure to achieve stop statistics or meet stop and arrest quotas in predominantly minority neighborhoods.  **AMF K, M, Q, DD, EE, FF, GG, HH.**
- Refusing to arrest an African American preacher without probable cause. **AMF Y**
- Objecting to discriminatory law enforcement practices prior to August 2014.  **AMF W, X.**

These qualify as protected activities under NMSA § 10-16C-3(A)(reporting to supervisor or third-party) and (C) (refusal to participate in unlawful or improper acts).  Because of the posture of the parties, the Court will not analyze whether the stops were in fact unlawful or improper.

### B.    Adverse Employment Action and Causality[5].

Defendant HPD argues that Plaintiff failed to show an adverse employment action or a causal connection with Plaintiff's protected activities.  Plaintiff does not appear to assert that he was constructively discharged.  Rather, he asserts he suffered other adverse employment actions.

Under the WPA, retaliatory action includes "taking any discriminatory or adverse employment action against a public employee in the terms and conditions of public employment." NMSA § 10-16C-2(D).  Courts "liberally define[ ] the phrase adverse employment action" and do

---

[5] In a footnote, Defendants argue that some of the alleged conduct occurred outside of the two-year statute of limitations.  Plaintiff raised the continuing violation doctrine. Defendants did not address the continuing violations theory in their reply brief.  To the extent this statute of limitations argument is not waived, the Court concludes that the continuing violation doctrine likely applies here, as other negative evaluations, discipline, or harassment occurred within two years of case filing.  *Ulibarri v. State of NM Corr. Academy,* 2006-NMSC-009, 11, 139 N.M. 193 (applying continuing violation doctrine to the NMHRA).

not limit such actions to "monetary losses in the form of wages or benefits." *Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 532 (10th Cir. 1998) (citation and quotation marks omitted).  The Court may consider acts that carry "a significant risk of humiliation, damage to reputation, and a concomitant harm to future employment prospects." *Berry v. Stevinson Chevrolet,* 74 F.3d 980, 986 (10th Cir.1996) (holding that the filing of false criminal charges against former employee constituted an adverse employment action because of its potential to harm future employment prospects); *Annett v. Univ. of Kansas*, 371 F.3d 1233, 1239 (10th Cir. 2004).  A strong indicator that a challenged employment action is adverse "is that the action causes harm to future employment prospects." *Hillig v. Rumsfeld*, 381 F.3d 1028, 1031 (10th Cir. 2004), *quoted in Braxton v. Nortek Air Sols., LLC*, 769 F. App'x 600, 605 (10th Cir. 2019).

A hostile work environment may also constitute an adverse employment action.  *Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1222–23 (10th Cir. 2015).  "Coworker hostility or retaliatory harassment constitutes an adverse employment action only if it is sufficiently severe."  *Medina v. Income Support Div., New Mexico*, 413 F.3d 1131, 1136–37 (10th Cir. 2005).

The harassment must be sufficiently "pervasive or severe to alter the terms, conditions, or privileges of [his] employment."  *Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1222 (10th Cir. 2015).  This analysis is generally fact-bound and unsuitable for summary judgment.  The Court considers the totality of the circumstances.  *Id.*  "Courts consider a variety of factors in this holistic analysis, including[ ] the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Id.*  (internal citations and quotation marks omitted).  An employer may be held liable for co-workers' retaliatory harassment where its supervisory or management personnel "either (1) orchestrate the harassment or (2) know about the harassment

and acquiesce in it in such a manner as to condone and encourage the co-workers' actions."

*Gunnell v. Utah Valley State Coll.*, 152 F.3d 1253, 1265 (10th Cir. 1998).

Under this broad definition, the Court finds that Plaintiff has created a genuine dispute of material fact whether he suffered adverse employment actions as follows.  In response to his refusal to meet stop and arrest quotas:

- Plaintiff was excluded from the buddy system or favored group at HPD. **AMF F.**
- Plaintiff was assigned jobs that nobody else wanted to do while other officers ate breakfast.  **AMF Q**
- Plaintiff was put on a performance improvement plan for minor reporting issues, although other similarly situated officers were not. **AMF W; Plaintiff's response to UMF 4.**

Moreover, after he was put on a performance improvement plan, Plaintiff reported Officer Berdoza's discriminatory use of the n-word and Defendant Herrera's failure to discipline Officer Berdoza.  AMF W.  In retaliation, Plaintiff suffered the following adverse employment actions:

- His relationship with his supervisor Defendant Herrera became strained and Defendant Herrera's behavior toward him changed.  **AMF W**
- Defendant Herrera started singling Plaintiff Ellis out over the radio for harassment.  **AMF X.**
- Defendant Herrera issued Plaintiff Ellis a series of negative monthly PIP evaluations. **AMF X.**
- After Plaintiff was transferred back under Defendant Herrera's supervision, Defendant Herrera identified Plaintiff Ellis in an internal affairs investigation, and HPD suspended Ellis for discussing the investigation, although similarly situated white officers also discussed the investigation and were not disciplined.  **AMF Z.**
- Plaintiff was counseled for not activating his pocket record, while similarly situated co-workers were not counseled for the same conduct.  **AMF AA.**

After Plaintiff reported race-based policing and the work environment to Joseph Cotton in February 2016, **AMF BB**, (1) HPD attempted to terminate him (**AMF AA**), (2) HPD increased pressure on him to meet stop quotas (**AMF DD, EE, FF, GG, HH**), and (3) Defendant Herrera gave Plaintiff a negative annual review (**AMF HH**).

The Court judges the severity of this harassment in the environment in which it occurred. *Lounds*, 812 F.3d at 1222-23.  One officer bragged to his shift that he "had jailed a lot of n***as today."  **Doc. 205 AMF R.**  Defendant Herrera was present but failed to discipline.  This language was used in the presence of Plaintiff Ellis.  The officers did not think it was a big deal to use these words in front of others in the shift.   **Doc. 205, AMF S, T.**  Moreover, Plaintiff has created a genuine dispute of material fact that Defendant Wright made racist comments and practiced discriminatory policing.  **Doc. 205-4, Ex. 5; Doc. 205 AMF F; Doc. 205 AMF E; Doc. 205 AMF X.**

The Court finds that there is a genuine dispute of material fact whether above were adverse employment actions.  *See Tapia v. City of Albuquerque*, 170 F. App'x 529, 534 (10th Cir. 2006) ("It is true that warning letters and reprimands can be adverse employment actions. A reprimand, however, will only constitute an adverse employment action if it adversely affects the terms and conditions of the plaintiff's employment—for example, if it affects the likelihood that the plaintiff will be terminated, undermines the plaintiff's current position, or affects the plaintiff's future employment opportunities.") (internal citations and quotation marks omitted), *citing Medina v. Income Support Div.,* 413 F.3d 1131, 1137 (10th Cir. 2005).  The timing of the above adverse employment actions, along with the disparate treatment of similarly situated officers, also creates a genuine dispute of material fact as to causation. **AMF G, I, J, N, Q, U, V, W, X, Z, AA, Plaintiff's response to Defendants' UMF 4;** *Annett v. Univ. of Kansas,* 371 F.3d 1233, 1237–38 (10th Cir.2004) (concluding that a period of two to three months between the protected activity and the alleged retaliatory action was close enough to establish a *prima facie* case of causation); *Anderson v. Coors Brewing Co.,* 181 F.3d 1171, 1179 (10th Cir.1999) (assuming that temporal proximity of two months and one week is sufficient to support a *prima facie* case of retaliation);

*Ramirez v. Oklahoma Dep't of Mental Health,* 41 F.3d 584, 596 (10th Cir.1994) (concluding that a one and one-half month period between protected activity and adverse action may establish causation).

### C. Legitimate Reason for Adverse Employment Actions.

Defendants assert they had a legitimate reason to discipline Plaintiff *and* retaliatory action was not a motivating factor. **Doc. 186 at 12-15.** This is an affirmative defense under NMSA § 10-16C-4:

> It shall be an affirmative defense to a civil action brought pursuant to this section that the action taken by a public employer against a public employee was due to the employee's misconduct, the employee's poor job performance, a reduction in work force or other legitimate business purpose unrelated to conduct prohibited pursuant to the Whistleblower Protection Act and that retaliatory action was not a motivating factor.

N.M. Stat. Ann. § 10-16C-4. However, for the reasons stated above, the Court finds it is in genuine dispute whether "retaliatory action was not a motivating factor." NMSA § 10-16C-4. Based on the totality of the circumstances and the asserted facts cited above, a reasonable jury could conclude that retaliatory action was a motivating factor. For example, Plaintiff was disciplined for failing to meet quotas. A reasonable jury could conclude that Plaintiff was disciplined for opposing discriminatory policing. Plaintiff has also shown that similarly situated officers were treated differently.

Therefore, Plaintiff's WPA claim survives against the City of Hobbs, HPD or Chief McCall in his official capacity. *Flores v. Herrera,* 384 P.3d 1070 (N.M. 2016) (NMWPA claim may only be asserted against entity or individual in official capacity).

### II. Count II: First Amendment Retaliation Claim.

Plaintiff also asserts a First Amendment Retaliation claim under § 1983 against Defendants HPD, Chief McCall, Herrera, White and Wright. **Doc. 205 at 17**. However, in his additional

material facts, Plaintiff primarily asserted facts against Chief McCall and Defendant Herrera.  *See*

**Doc. 205 at 3-11; Doc. 186-12** (admitting he does not bring a claim against Defendant Wright)**.**

Plaintiff does not argue how his claims could survive against Defendants White and Wright.

Therefore, the Court will only analyze whether HPD (the City of Hobbs), Defendant Herrera and

McCall violated Plaintiff's First Amendment rights.  Defendants did not assert qualified immunity.

 "[P]ublic employees do not surrender all their First Amendment rights by reason of their

employment." *Garcetti v. Ceballos*, 547 U.S. 410, 417, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006).

However, a public employer has a legitimate interest "in promoting the efficiency of the public

services it performs through its employees." *Id.* (quoting *Pickering v. Board of Ed. of Twhp. High*

*Sch. Dist. 205, Will Cty.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)). To evaluate

whether the public employee's constitutionally protected interest in free speech was violated,

courts use a five-step test, commonly known as the *Garcetti/Pickering* test, which considers:

> (1) whether the speech was made pursuant to an employee's official duties;
> (2) whether the speech was on a matter of public concern;
> (3) whether the government's interests, as employer, in promoting the efficiency of
> the public service are sufficient to outweigh the plaintiff's free speech interests;
> (4) whether the protected speech was a motivating factor in the adverse
> employment action; and
> (5) whether the defendant would have reached the same employment decision in
> the absence of the protected conduct.

*Helget v. City of Hays, Kansas*, 844 F.3d 1216, 1221 (10th Cir. 2017) (internal quotation marks

omitted). "The first three steps of the *Garcetti*/*Pickering* test, which determine whether the speech

was constitutionally protected, are ordinarily matters of law for a court to decide, and the final two

steps are ordinarily questions of fact." *Singh v. Cordle*, 936 F.3d 1022, 1034 (10th Cir. 2019).

Defendants assume for this motion only that Plaintiff can meet the first three prongs of the

test.  However, Defendants argue that this claim fails on the last two prongs "for the same reasons

that his NMWPA claim fails." **Doc. 186 at 16.** Defendants largely refer to their arguments against the NMWPA claim. *See* **Doc. 186 at 16.**

### A.    Fourth Prong

"Under the fourth prong of *Garcetti*, plaintiffs bear the burden of establishing both a detrimental employment decision and 'causation – that is, that the constitutionally protected speech was a substantial motivating factor in the employer's decision to adversely alter the employee's conditions of employment." *Couch v. Bd. of Trustees of Mem'l Hosp. of Carbon Cty.*, 587 F.3d 1223, 1236 (10th Cir. 2009). "An employee need not prove his speech was the sole reason for the defendant's actions." *Maestas v. Segura*, 416 F.3d 1182, 1189 (10th Cir. 2005). However, "the employee must show the protected speech played a substantial part in the employer's decision to adversely alter the employee's conditions of employment." *Id.* Defendants assert that they did not take any adverse employment actions against Plaintiff Ellis, and Defendants' actions were not motivated by Plaintiff's protected activity.

In the First Amendment context, an adverse employment action may include substantial harassment or abuse, removing job duties, giving an employee a written reprimand, or a poor performance rating. *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1207–08 (10th Cir. 2007). For the reasons stated above, the Court concludes there is a genuine dispute of material fact whether Plaintiff suffered an adverse employment action and whether the protected speech[6] was a motivating factor in the adverse employment action. *See* Section II, *supra*.

For example, there is a genuine dispute of material fact whether Defendant Herrera harassed Plaintiff Ellis after he reported the use of the n-word. **AMF W, X, Y, CC, DD.** After Chief McCall learned of Plaintiff's report to Joseph Cotton, Plaintiff was pressured by his

---

[6] Because the first three prongs were not challenged, the Court assumes that Plaintiff engaged in protected speech.

supervisors, including Defendant Herrera, to perform more traffic stops in African American communities and was given negative evaluations and reprimands for refusing to do so.  **AMF DD-HH.**

B.     **Fifth Prong.**

Defendants argue that they have "demonstrated that [they] would have taken the same action against the employee even in the absence of the protected speech." *Brammer-Hoelter*, 492 F.3d at 1203.  Defendants argue that Plaintiff was not an effective police officer.  Defendants in part point to instances in which Plaintiff was reprimanded by his superiors for failing to meet quotas – or attacked for his work ethic.  The Court finds there is a genuine dispute of material fact whether Plaintiff would have been reprimanded or harassed had (1) he not objected to the quota system or racially discriminatory police practices and (2) not reported the use of the n-word and discriminatory police practices.

C.     **Individual Defendants.**

Defendants also assert that Plaintiff cannot show that the individual defendants are liable under § 1983.  The Court concludes that there is sufficient evidence that a reasonable jury could conclude that Defendants McCall and Herrera each retaliated against Plaintiff for his speech, for the reasons stated in Section II of this opinion.

Chief McCall may not be held vicariously liable under § 1983 merely because he is a supervisor.  Plaintiff may show liability through Chief McCall's personal participation.  For example, Plaintiff may show that a supervisor's subordinates violated the constitution and an "affirmative link exist between the constitutional deprivation and either the supervisor's personal participation, his exercise of control or direction, or his failure to supervise." *Fogarty v. Gallegos,* 523 F.3d 1147, 1162 (10th Cir. 2008).  As to deliberate indifference, the defendant must know "his

actions created a substantial risk of constitutional injury." *Dodds v. Richardson*, 614 F.3d 1185, 1205-06 (10th Cir. 2010).

Chief McCall was responsible for the "quota" policy. **Doc. 205-1, Ex. 2.** A reasonable jury could conclude that Chief McCall knew that his supervisory officers were forcing their shifts to target minority communities as part of his push to meet quotas, and that officers were threatened with adverse employment actions if they failed to meet numbers. Plaintiff had objected to discriminatory police practices and spoke to Joseph Cotton, the local leader of the NAACP. Joseph Cotton discussed discriminatory policing practices with Chief McCall. Chief McCall knew that Plaintiff had reported to Joseph Cotton. Nevertheless, Chief McCall continued to allow a practice of taking adverse employment actions for failing to meet quotas. **AMF DD-HH**. A reasonable jury could conclude that Chief McCall was taking retaliatory action against Plaintiff for objecting to these alleged discriminatory practices. As to Defendant Herrera, the asserted facts against him are extensively discussed in Section II and the Undisputed Facts section.

Although Plaintiff asserts that Defendant Wright committed racially discriminating police practices, he did not assert in his additional material facts whether Defendant Wright harassed him or took adverse employment actions against him. Therefore, Plaintiff Ellis' claims under Count II remain as to Defendants McCall and Herrera but dismissed as to the remaining individual Defendants.

## III.   Count III: Section 1981 racial discrimination.

Defendants sought summary judgment as to Plaintiff's § 1981 racial discrimination claim. Section 1981 provides that all persons "shall the have same right… to make and enforce contracts… as is enjoyed by white citizens." § 1981. It authorizes "a plaintiff to bring a claim for hostile work environment based on unlawful race discrimination." *Lounds v. Lincare, Inc.,* 812

F.3d 1208, 1221 (10th Cir. 2015).  Plaintiff appears to assert (1) a hostile work environment claim and (2) a disparate treatment claims against Defendants McCall, Herrera, Blevins, and Murphy. However, because Plaintiff asserted most of his material facts against only McCall and Herrera, the Court will only analyze Count III claims against them.

### A.      Hostile Work Environment.

Under § 1981, to assert a prima facie case of racial harassment/hostile work environment, Plaintiff must show that "under the totality of the circumstances (1) the harassment was pervasive or severe enough to alter the terms, conditions, or privilege of employment, and (2) the harassment was racial or stemmed from racial animus." *Bolden v. PRC Inc.,* 43 F.3d 545, 551 (10th Cir.1994) (internal citations omitted).  He must demonstrate "that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *McCowan v. All Star Maint., Inc.,* 273 F.3d 917, 923 (10th Cir. 2001) (internal quotations and citations omitted).

Generally, "[t]he same substantive standards apply to a hostile work environment claim regardless of whether the plaintiff has brought it under § 1981 or Title VII." *Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1221 (10th Cir. 2015), *citing Aramburu v. Boeing Co.,* 112 F.3d 1398, 1410 (10th Cir. 1997).  Accordingly, the Court may look to case law interpreting Title VII claims. *Id.* This standard is more difficult to overcome than under the First Amendment.  *Couch,* 587 F.3d at 1237.  Unlike Title VII, under §1981 Plaintiff must show direct personal involvement by each individual defendant or custom.  To carry his burden Plaintiff must establish the following elements:

> "(1) [he] is a member of a protected group; (2) [he] was subject to unwelcome harassment; (3) the harassment was based on [race]; and (4) [due to the

harassment's severity or pervasiveness], the harassment altered a term, condition, or privilege of the plaintiff's employment and created an abusive working environment.

*Lounds v. Lincare, Inc.,* 812 F.3d 1208, 1222 (10th Cir. 2015).

As noted above, Plaintiff must show that the "harassment was racial or stemmed from racial animus." *Bolden v. PRC Inc.,* 43 F.3d 545, 551 (10th Cir.1994), *quoted in Mitchell v. City & Cty. of Denver*, 112 F. App'x 662, 671 (10th Cir. 2004). "[T]he existence of [racial] harassment must be determined in light of the record as a whole, and the trier of fact must examine the totality of the circumstances, including the context in which the alleged incidents occurred." *McCowan v. All Star Maint., Inc.*, 273 F.3d 917, 925 (10th Cir. 2001) (internal citations and quotation marks omitted). The Court considers "a variety of factors" in this holistic analysis, "including[ ] the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1222 (10th Cir. 2015).

Pervasiveness and severity are informed by the environment of the department, which Plaintiff has asserted was racially discriminatory. There must be "careful consideration of the social context in which particular behavior occurs and is experienced by its target." *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998);

For the reasons stated above (Undisputed Facts Section; Section II) Plaintiff has created a genuine dispute of material fact whether (1) the harassment was pervasive or severe enough to alter the terms, conditions or privileges of employment and (2) the harassment was racial or stemmed from racial animus. *See* **Doc. 205, AMF G-T**. This is true as to both Defendants McCall and Herrera.

The asserted facts and record reflect that Chief McCall installed a system of favoritism among a core circle of officers who fostered a culture of race-based policing and whom HPD

23

declined to discipline.  **AMF A-N, Q-W, EE-II**.  Plaintiff asserts he was disciplined for refusing to participate in racially disparate policing.

Moreover, theses specific instances of harassment cannot be viewed in a vacuum.  Rather, they occurred in an environment of racial animus and harassment.  ***See* Doc. 205, AMF D-N, T, U, V, W, X, Z**.  One officer bragged to his shift that he "had jailed a lot of n***as today."  **Doc. 205 AMF R.**  A supervisor, Defendant Herrera, was present but failed to discipline.  The officers did not think it was a big deal to use these words in front of others in the shift.  **Doc. 205, AMF S.** Officers were not disciplined.  *Id.* **AMF S, T**.  Plaintiff presented evidence that the use of the - word was accepted without any discipline aside form "verbal counseling." Another officer commented that African American inmates were "fuckin' pieces of shit."  **AMF N**

Based on this environment, a reasonable jury could conclude this discipline was racial or stemmed from racial animus Plaintiff asserted facts showing that Chief McCall either personally participated in it or was deliberately indifferent.  **AMF D-N, T, U, V, W, X, Z**.  For the reasons stated above, a reasonable jury could also conclude that Defendant Herrera retaliated against African American officers or was deliberately indifferent.

### B.    Disparate Treatment.

A claim of disparate treatment encompasses "a situation where the employer simply treats some people less favorably than others because of their race, color, religion or national origin." *Drake v. City of Fort Collins,* 927 F.2d 1156, 1159 (10th Cir.1991), *quoted in Mitchell v. City & Cty. of Denver*, 112 F. App'x 662, 670 (10th Cir. 2004).  The elements of a prima facie case are the same whether the claim is brought under Title VII, § 1981 or § 1983. *Id.* at 1162. To establish a prima facie case of racial discrimination under § 1981 Mitchell must demonstrate (1) he is a member of a protected class, (2) he suffered an adverse employment action, and (3) similarly

situated employees were treated differently. *Trujillo v. Univ. of Colo. Health Sci. Ctr.,* 157 F.3d 1211, 1215 (10th Cir.1998). "Proof of discriminatory … motive can in some situations be inferred from the mere fact of differences in treatment." *Maldonado v. City of Altus*, 433 F.3d 1294, 1308 (10th Cir. 2006). Defendants do not appear to dispute that Plaintiff is a member of a protected class.

Here, the Court finds that Plaintiff has asserted sufficient material facts, supported in the record, to create a genuine dispute of material fact (1) whether he suffered an adverse employment action and (2) whether similarly situated employees were treated differently. As explained in the Undisputed Facts and Section II, Plaintiff has asserted that he was disciplined or treated different from similarly situated white officers. *See also* **Doc. 205 at 2; AMF Y, W, Z, AA; Plaintiff's response to UMF 4, Doc. 205, Ex. 10.**

Plaintiff created a genuine dispute that Chief McCall participated in, created a policy, or was deliberately indifferent to the disparate treatment. **AMF D-N, T, U, V, W, X, Z.** A reasonable jury could also conclude that Defendant Herrera participated in or was deliberately indifferent to the disparate treatment.

## CONCLUSION

Plaintiff Ellis has created a genuine dispute of material fact and supported those fact in the record. Although Defendants dispute these facts, the Court cannot weigh the evidence on summary judgment. Plaintiff Ellis' claims against certain Defendants under Counts I, II, and III survive. Specifically, the Court concludes that Plaintiff created a genuine dispute of material fact as to his New Mexico Whistleblower Protection Act claim (Count I). Count I survives against the City of Hobbs, HPD and Chief McCall in his official capacity. Plaintiff's First Amendment claim (Count II) survives against Chief McCall in his individual and official capacity, and Herrera. Finally, as

to Count III, Plaintiff's § 1981 racial harassment and disparate treatment claims survive against Defendants McCall and Herrera.  Plaintiff Ellis' claims against the other individual Defendants are dismissed.

**IT IS THEREFORE ORDERED** that Defendants' Motion for Summary Judgment (**Doc. 186**) is **GRANTED IN PART** and **DENIED IN PART.**

KEA W. RIGGS
UNITED STATES DISTRICT JUDGE